CITY OF GROTON et al., Plaintiff-
Petitioner-Appellants,

v.

FEDERAL POWER COMMISSION, De-
fendant-Respondent-Appellee,

and

The Connecticut Light and Power Com-
pany, Intervenor-Respondent.

No. DC–13.

Temporary Emergency Court of Appeals.

Oct. 30, 1973.

Grace Powers Monaco, Washington, D. C., Charles F. Wheatley, Washington, D. C., on the brief for appellants.

Charles J. McClees, Atty., Washington, D. C., for F. P. C., Leo E. Forquer, Gen. Counsel, George W. McHenry, Jr., F.C.C., on the brief for appellee.

James R. McCotter, Jerome Ackerman, Covington & Burling, Washington, D. C., James R. McIntosh, Paul F. McAlenney, Day, Berry & Howard, Hartford, Conn., on the brief for intervenor.

Before TAMM, Chief Judge, and VAN OOSTERHOUT and HASTINGS, Judges.

TAMM, Chief Judge.

The City of Groton et al. [hereinafter "Cities"] sought review in the United States District Court for the District of Columbia of Federal Power Commission [hereinafter "Power Commission"] Order No. 437A–12 of October 12, 1972. Cities brought their action pursuant to §§ 211(a), (d)(1), and (e)(1) of the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (Supp. II, 1972). Defendants below were the Price Commission [now Cost of Living Council] [1] and the Power Commission. The motion of Connecticut Light & Power Co. [hereinafter "CL&P"] to intervene as of right was granted.

In the course of proceedings in the trial court, all parties moved for summary judgment with the Cost of Living Council additionally moving to dismiss as to the Council. Following oral argument, the trial court granted the Power Commission's and CL&P's motions for summary judgment, granted the Cost of Living Council's motion to dismiss, and denied the Cities' motion for summary judgment.[2] Formal findings of fact and conclusions of law were filed on July 9, 1972, and this appeal [3] followed. For the reasons stated below, we affirm.

I.

The chronology of this rather complex situation must be clearly understood and so is set out at length. Plaintiff-appellants City of Groton, Borough of Jewett City, Second and Third Taxing Districts of City of Norwalk, City of Norwich and Town of Wallingford are public agencies organized and existing under the laws of the State of Connecticut. The aforesaid appellants own and operate their own electric systems and purchase electricity at wholesale prices from CL&P. Appellee CL&P is a public electric utility company engaged principally in the generation, transmission and sale of electricity in the State of Connecticut. In this regard, CL&P is subject to the regulation of the Power Commission pursuant to subchapter II of the Federal Power Act, 16 U.S.C. § 824 et seq. (1970).

On January 1, 1963, CL&P and Cities entered into contracts for the sale and purchase of electricity. These contracts were filed with the Power Commission on July 29, 1964, as CL&P's rate schedules pursuant to Section 205 of the Federal Power Act, 16 U.S.C. § 824d (1970). These rate schedules became effective pursuant to the provisions of the Federal Power Act and remained so at all times relevant to this case.[4] Each of these contracts contained an identical fuel adjustment clause.[5] Basically, this clause permitted CL&P to increase the rates charged its wholesale customers, including Cities, to reflect increases in

---

1. The Cost of Living Council was created as successor to the Price Commission by Phase III regulations. 38 Fed.Reg. 6099 (March 6, 1973).

2. CL & P's counterclaim for certain monies claimed owing to CL & P by Cities is still pending before the District Court.

3. Pursuant to § 211(b)(2) of the Economic Stabilization Act Amendments of 1971, 12 U.S.C. § 1904 (Supp. II 1972).

   Cities moved, pursuant to Rule 42(b) Fed. R.App.Proc. for voluntary dismissal of their appeal in so far as it pertained to the Cost of Living Council. This court granted said motion August 28, 1973.

4. CL & P filed new tariff provisions with the Power Commission on June 16, 1972. These new provisions became effective January 16, 1973. Thus, the previously filed rate schedules were fully effective during the period in question here—November 14, 1971 to October 12, 1972.

5. *Fuel Cost Adjustment Applicable To All Energy Charges*

   The Energy Charge specified above is based upon an average fuel price of 37 cents per million Btu for fuel delivered alongside the Power Company's generating stations. *If the average cost of such fuel is above or below 37 cents per million Btu, an adjustment shall be made in the Energy Charge for each one-tenth of a cent above or below 37 cents per million Btu.*

   The amount of such adjustment shall be determined by multiplying the variation in the price per million Btu of fuel burned during the month above or below 37 cents by the average amount of fuel burned per kilowatt-hour during the past 12 months, adjusted to give effect to hydro generated energy and corrected for delivery losses.

the cost of fuels used to generate electricity.[6]

On August 15, 1971, the President issued Executive Order No. 11615, 3 C.F.R. 199 (1972) exercising his authority under the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 (Supp. II, 1972), to issue appropriate orders for the stabilization of prices, rents, wages and salaries. This executive order [Phase I] froze prices for 90 days at the highest level charged during the previous 30-day period. In compliance with this order and implementing regulations issued by the Power Commission,[7] CL&P did not increase its rates to Cities pursuant to the fuel adjustment clause during the 90-day freeze from August 15, 1971 to November 14, 1971. Nothing done during this period is in issue in the instant case.

On October 15, 1971, the President issued Executive Order No. 11627, 3 C.F.R. 218 (1972), [Phase II] which created

the Price Commission to exercise such control over prices and rents as the Cost of Living Council delegated to it. Pursuant to authority subsequently delegated to it,[8] the Price Commission issued regulations to govern all changes in prices on or after November 14, 1971. 36 Fed.Reg. 21953–55 (1971). Section 300.016 of said regulations specifically governed rate increases by regulated public utility companies. Section 300.-016(a) provided generally that public utilities such as CL&P, could increase their rates provided "such increase [had] been approved by a regulatory agency." The utility was required to notify the Price Commission of the agency's approval or authorization.[9] Section 300.016(b) [10] was a special rule, governing utility rate increases which "were approved" by a regulatory agency before November 14, 1971, but which were not permitted to take effect due to Phase I. It required the regulatory

6. The primary purpose of the fuel adjustment clauses allowed by the Power Commission is to keep current both the base price of fuel and the operating efficiencies. Such a clause permits a utility to pass on to its customers current increases or decreases in fuel costs without the necessity of making rate filings ordinarily required to effect rate changes. *See* Amending Regulations to Govern the Filing of Rate Schedules by Public Utilities and Licensees, Docket No. R–227 (Notice of Proposed Rulemaking), 28 Fed.Reg. 129 (1963).

7. Order No. 437, 18 C.F.R. § 2.90 (1973), issued August 18, 1971, provided that increases in rates to become effective after August 14, 1971, as a result of "automatic or other escalations" would not take effect for the 90 day period established by Executive Order No. 11615.

8. Cost of Living Council Order No. 4, 6 C.F.R. 432 (1971).

9. On November 17, 1971, the Price Commission amended § 300.016(a) to reserve to itself "the right to review and limit the amount of any such requested increase, ordered increase, or other authorized increase." 36 Fed.Reg. 22014 (1971).

10. § 300.016 Regulated Public Utilities

. . . . .

(b) *Special rule.* In the case of rate increases which were approved by a regu-

latory agency or other appropriate legal authority before November 14, 1971, but which were not permitted to take effect due to Executive Order 11615, such rate increase may take effect with respect to transactions occurring after November 13, 1971. However, before such increases may take effect, such regulatory agency or other appropriate legal authority shall review such increases with regard to their consistency with the purposes of the Economic Stabilization Act of 1970, as amended, and certify that any such increases or adjusted increases are consistent with such purposes. Such certification, together with a report of the increased rate schedule thus put into effect, showing the amount of such increased rates, shall immediately be supplied to the Commission by any regulated person which receives such certification and which had gross receipts of $50 million or more during its most recent fiscal year. 36 Fed.Reg. at 21953–54.

Note that Sections 300.016(a) and (b) were renumbered, without substantive change, to 300.16(a) and 300.16(b). 36 Fed.Reg. 23977 (1971). They will be referred to by their renumbered designations for the balance of this opinion.

agency to review such increases to insure consistency with the Economic Stabilization Act before the increases could become operative. In the case of CL&P, the "regulatory agency" referred to in these Price Commission regulations is the Federal Power Commission.

In order to implement these Price Commission regulations, the Power Commission issued Order No. 437A, 18 C.F. R. § 2.90a on November 16, 1971. Order 437A did not deal specifically with rate increases under a fuel adjustment clause, but rather concerned itself with future general rate increases. On December 10, 1971, the Power Commission issued Order No. 437A–5 [11] specifically establishing review procedures for existing fuel adjustment clauses. This order identified all public utility companies, including CL&P, having rate schedules on file with the Power Commission containing fuel adjustment clauses, the operation of which was suspended by Phase I and Order No. 437. This order required that each public utility review its fuel adjustment clauses and certify to the Power Commission that any increase in rates resulting from the operation of a fuel adjustment clause was in compliance with section 35.14 of the Commission's Regulations.[12] Utilities so certifying were directed to include supporting data in accordance with the various subparts of section 35.14. Further, ordering paragraph (B) of Order 437A–5 provided as follows:

(B) Each public utility, upon the filing of that certification, which meets the requirements of Section 35.-14 of the Commission's Regulations under the Federal Power Act, will be so notified by the Commission's Secretary and thereupon shall be deemed to have satisfied the purposes of paragraph (d) of Section 2.90a of the Commission's General Policy and In-

terpretations, so as to permit the affected fuel clauses to be operative, but in no event earlier than 12:01 a.m., November 14, 1971.

J.A. at 4.

In response to Order 437A–5, CL&P certified in writing to the Power Commission that any increases in rates arising from operation of its fuel adjustment clauses would be in compliance with Section 35.14 of the Power Commission's Regulations. This letter of December 23, 1971,[13] also included supporting data by which it intended to be in compliance with the subparts of Section 35.14. CL&P informed the Power Commission that if notification was received from the Power Commission, it intended to make increases resulting from its fuel adjustment clauses operative as of 12:01 a.m., November 14, 1971, in accordance with Commission Order 437A–5.[14]

On January 14, 1972, the Price Commission promulgated revised regulations covering public utilities to be effective January 17, 1972. 37 Fed.Reg. 652–54. Section 300.16(c) provided:

(c) *Price increases to which reporting and certification requirements do not apply.* The reporting and certification requirements of this section do not apply to any price increase resulting from the pass-through of specific allowable costs, including taxes (except income taxes) and fuel costs, but not including labor costs, if the increase is not objected to by the appropriate regulatory agency and is authorized by statute, regulation, or order of the appropriate regulatory agency, or by an approved tariff provision.

37 Fed.Reg. 653.

The Price Commission, on September 16, 1972, again revised its public utility

---

11. J.A. at 1–8.

12. Section 35.14 sets standards for acceptable fuel adjustment clauses.

13. J.A. at 9.

14. CL & P likewise informed Cities by a statement which accompanied invoices from CL & P to Cities in January 1972 and following months. Appellee's Brief, Appendix B.

regulations. Section 300.308(e) of these regulations provided as follows:

Certain allowable costs. A public utility may place in effect, without regard to the reporting and certification requirements of this section, any price increase resulting from the pass-through of specific allowable costs, including taxes (except income taxes) and fuel costs, but not including labor costs, if the increase is authorized by statute, regulation, or order of the appropriate regulatory agency, or by an approved tariff provision (e. g., a fuel adjustment clause).

6 C.F.R. § 300.308(e) (1973).

During the period from December 23, 1971 to June 23, 1972, there occurred correspondence between the Secretary of the Power Commission and CL&P in connection with the substantiating data required by § 35.14 of the Regulations.[15] Finally, it appears that the Power Commission was satisfied, and on October 12, 1972, the Power Commission issued Order No. 437A–12.[16] In its order, the Power Commission ruled that CL&P's fuel adjustment clause was in conformity with Section 35.14 of the regulations, and consistent with the Economic Stabilization Act. Order 437A–12 provided in relevant part:

In accordance with Section 2.90a(d) of our General Policy and Interpretations, as quoted above CL&P's fuel adjustment clause shall become effective as of 12:01 a.m., November 14, 1971. In our opinion municipal customers in their briefs, have not set forth sufficient reasons to justify an effective date other than November 14, 1971. This date, however, may be subject to authorization by the Price Commission and we shall so provide.

Order No. 437A–12 then provided as follows:

The Commission Orders:

(A) In accordance with the above findings Connecticut Power and Light's [sic] Fuel Clause in its FPC Rate Schedules is hereby certified as consistent with the purposes of the Economic Stabilization Act of 1970, as amended, as required by Order No. 437A pursuant to Section 300.16 of Chapter III, Title VI of the Code of Federal Regulations.

(B) Connecticut Power and Light [sic] company is authorized to implement the billing to its affected customers pursuant to its fuel adjustment clause as of November 14, 1971, subject to authorization by the Price Commission.

J.A. at 52.

CL&P wrote to the Price Commission on October 20, 1972, requesting a statement that under Section 300.308(e) of the Price Commission's Regulations CL&P's fuel adjustment clause could be made operational again as of 12:01 a. m., November 14, 1971, in accordance with Power Commission Order No. 437A–12 without specific approval by the Price Commission. The General Counsel for the Price Commission by letter of November 28, 1972,[17] stated that CL&P's fuel clause was subject to § 300.308(e) of the Price Commission's Regulations. Since these regulations provided that rate adjustments pursuant to a fuel adjustment clause need not be submitted to the Price Commission for approval, the letter concluded that the clause could become operative as of November 14, 1971, according to the terms of Order No. 437A–12.

Cities applied for rehearing of Order 437A–12 urging that it constituted an illegal retroactive rate increase and further that it approved a defective fuel adjustment clause in contravention of Order No. 437A–5. (J.A. 53–56.) The Power Commission denied the motion for rehearing. (J.A. 58–60.) In the order denying rehearing the Power Commission noted that ratemaking had not been involved in Order No. 437A–12. The Power Commission contended that

---

15. A detailed description of the contents of these letters appears infra at 933–934.

16. J.A. at 50–52.

17. J.A. at 120–21.

CL&P's fuel clause was operative prior to the institution of Phase I and would have remained operative but for Executive Orders Nos. 11615 and 11627. The Power Commission further stated that in approving the clause it had not made new rates, but had satisfied itself that the clause was harmonious with the President's stabilization program. (J.A. at 58.) The Power Commission reiterated its finding that the clause was not inconsistent with § 35.14.

On January 10, 1973, Cities filed suit in the United States District Court. It was there alleged that the Power Commission's Order No. 437A–12 was not authorized under the Economic Stabilization Act or the Federal Power Act. Further, Cities alleged that the Price Commission's order of November 28, 1972, was contrary to applicable regulations governing the period in question to the extent that it approved Order No. 437A–12.[18]

The dispute thus concerns at what point in Phase II CL&P could begin to pass on to Cities, pursuant to the fuel adjustment clause, higher fuel costs which it experienced. CL&P asserts that it is entitled to be reimbursed for additional incremental fuel costs from November 14, 1971; the Power Commission agrees. Cities argue that the operation of the fuel adjustment clause should be negated from November 14, 1971 until October 12, 1972 when the Power Commission issued Order No. 437A–12. The additional fuel costs incurred by CL&P during the period amount to approximately $350,000.

## II.

Despite the apparent complexity of this situation which encompasses numer-

ous orders and regulations, we believe that the questions of statutory interpretation raised herein may be simply resolved. The liminal question is which Price Commission regulations should be examined to test the validity of Order No. 437A–12. CL&P and the Power Commission assert that under § 300.-16(c) and 300.308(e) of the Price Commission's regulations, *no action* by the Power Commission or the Price Commission was required before the fuel adjustment clause could become operative. It is urged that the Power Commission, when it issued order 437A–5, created procedures for the review of fuel adjustment clauses which exceeded the requirements ultimately developed by the Price Commission.[19] Such a finding was specifically rejected by the trial court.

Cities contend, on the other hand, that § 300.16(b) (November 13, 1971) is controlling in this action, notwithstanding subsequent promulgation of § 300.16(c) (January 17, 1972) and 300.308(e) (September 18, 1972). It is Cities' argument that because the fuel adjustment review proceeding which culminated in Order 437A–12, here under review, began in response to Order No. 437A–5 in December, 1971, we must judge the Commission's acts in light of the reasons that the Commission itself gave at the time of Order 437A–12. National Air Carrier Ass'n v. CAB, 141 U.S.App.D.C. 31, 436 F.2d 185, 195 (1970).[20]

▮ We find it unnecessary to decide this issue because it is clear that judged under either regulation, the pass-through of costs under CL&P's fuel adjustment clause was valid as of the beginning of Phase II.

18. We note that in a related case, Cities appealed Order No. 437A–12 under § 313(b) of the Federal Power Act, 16 U.S.C. § 825l (1970) in an action entitled Connecticut Municipal Group v. FPC, No. 72–2208 (D. C. Cir. December 18, 1972). Cities therein alleged that the FPC had violated its regulations under the Economic Stabilization Act and had exceeded its authority under the Federal Power Act. The appeal was dis-

missed for lack of jurisdiction by court order of July 23, 1973 (J.A. at 78).

19. Brief of Appellee-Intervenor at 10; Brief of Appellee at 17–18.

20. Apparently, Order 437A–5 is still in effect. We do not by this discussion, express any opinion as to its current validity nor whether it is indeed excessive in light of later Price Commission regulations, *e., g.,* 300.308(e).

Assuming that CL&P and the Commission are correct, Section 300.16(c) superceded original sections 300.16(a) and (b). 37 Fed.Reg. 652–53 (January 14, 1972). Section 300.16(c) [21] specified certain rate increases which did not require review for consistency with the Economic Stabilization Program because they operated to pass through only price increases which were necessarily cost justified and therefore in conformance with Phase II criteria. The Price Commission, in 300.16(c) and 300.308(e), provided that CL&P's fuel adjustment clause, suspended by Phase I, could be made operational again at the beginning of Phase II [22] *with no review by the Power Commission.*[23] Therefore the Power Commission's review of the clause, begun on the assumption that review was required by section 300.16(b), was unnecessary.

Alternatively, if we conclude that we must judge the validity of Order 437A–12 in light of Order 437A–5 and § 300.16(b) of the Price Commission's regulations, we arrive at the heart of Cities' argument. Cities contend that because of the adjustment in loss factor [24] agreed to by CL&P in correspondence with the Secretary, the Commission could not legally find that

CL&P had properly certified its *existing* fuel adjustment clause as required by Order No. 437A–5. Thus, it is argued, by finding that Order 437A–5 was met, the Commission acted unlawfully in issuing Order 437A–12.[25] The controversy centers over what legal effect should be accorded to the letters between the Secretary and CL&P. Accordingly, we must examine these letters in some detail.

The fuel adjustment clause in the Cities-CL&P contract provided only that fuel adjustment charges would be "adjusted for delivery losses." CL&P had at all times prior to Phase II employed a *systemwide* loss factor to the fuel adjustments of both Cities and its lower voltage customers. CL&P apparently felt that individual loss factors, reflecting different delivery voltages, could not readily be calculated. (J.A. at 43.) The Secretary of the Power Commission wrote to CL&P on February 22, 1972, stating that compliance with Order No. 437A–5 would "require supporting data which should include, *inter alia,* . . . the loss factor adjustment to reflect delivered energy . . . ." (J.A. at 10.) CL&P responded on March 14, 1972 pointing out that "delivery efficiency" ranged from .90413 to

21. Section 300.16(c) was carried over into Section 300.308(e) of the recodification of public utility regulations.

22. The fact that Section 300.16(c) was promulgated on January 14, 1972, several months after the beginning of Phase II, is of no import. The clear language of the regulation compels the understanding that increases covered by it would be allowed from the beginning of Phase II. By any other interpretation (i. e. that pass through only be allowed from the date of promulgation of the new regulation), the Price Commission's determination that such increases were *per se* consistent with Phase II would be frustrated for the period from November 14, 1971 to January 13, 1972.

23. In order for CL & P's fuel clause to satisfy § 300.16(c) it must have been (a) "not objected to by the [Power Commission]" and (b) "authorized by statute, regulation, or order of the [Power Commission] or by an approved tariff provision." Both requirements were clearly met. The correspondence between the Secretary and

CL & P did not constitute an "objection" to the clause. *See* discussion at 933–934 *infra.* CL & P's fuel clause was certainly authorized by "an approved tariff provision." The clause was filed with the Power Commission on July 29, 1964, as part of CL & P's rate schedule and became effective in accordance with § 205 of the Federal Power Act. Furthermore, fuel adjustment clauses were cited specifically as examples of "allowable costs" in § 300.308(e), recodifying § 300.16 (c).

24. Simply stated, when electricity is transmitted to the buyer through power lines, some loss occurs. Since a fuel adjustment clause is designed to pass on to the consumer higher costs of fuel *generation,* the charges passed through must be adjusted to reflect the fact that less electricity is delivered than generated. This is the "loss factor."

25. Cities do not claim that Order No. 437A–5 is in violation of, or inconsistent with, the Economic Stabilization Act.

.91320 in 1969 and 1971 respectively. (J.A. at 11–12.) The Secretary then asked CL&P to explain "the use of the [systemwide] loss factor in light of the fact that the bulk of retail customers are served at lower voltages." (J.A. at 14.) On June 2, 1972 CL&P replied that it could not readily calculate losses at discrete voltage levels, and that it felt estimation would "reduce the overall accuracy of the calculations." (J.A. at 15.) On June 23, 1972, CL&P indicated to the Secretary that it could then estimate losses to bulk transmission customers, such as Cities. CL&P proposed a loss figure of 3.5% giving a delivery efficiency of .965. CL&P further stated

> If it will resolve the matter, we would be willing to apply this efficiency factor of .965 in the fuel adjustment computations from November, 1971 for all of the wholesale for retail customers.

J.A. at 16.

Cities concludes from this correspondence that the fuel adjustment clause which the Power Commission approved was not initially in compliance with Section 35.14 of the regulations, and therefore could not, under Order 437A–5 be approved. Our examination of the correspondence persuades us that these letters were merely a request for additional data to facilitate a determination by the Power Commission that the fuel adjustment clause was consistent with § 35.14. Cities have not attempted to convince this court (nor could they) that the Secretary, acting *alone*, could in any manner rule on the validity of the clause. These letters are not an action of the Power Commission, nor a determination that the clause was not in compliance. Indeed, the Power Commission stated clearly in Order 437A–12 that CL&P's fuel clause was "in conformity with Section 35.14 . . . ." (J.A. at 51.)

Our decision is further supported by a statement of the Power Commission, in denying rehearing, which clearly negates Cities' contention. The Commission stated:

> CMG is in error in insisting on the fact that the fuel adjustment clause in effect on August 14, 1971 was not in conformity with Section 35.14 of the Rules and Regulations. Again this results from confusing the certification process set out in Order No. 437A–5 with the issues that may arise in a general rate case. Contrary to CMG's assertions we have not found that CL&P's fuel clause, as it existed on August 14, 1971 is inconsistent with Section 35.14 of our Regulations.

J.A. at 59.

■ This court has stated in City of New York v. New York Telephone Co.:

> Moreover agency expertise is particularly useful here since appellants seek an interpretation of a procedural rule adopted by the Commission itself. It is well established that agency input is extremely helpful in interpretation of its own regulations. [Footnote omitted.]

468 F.2d 1401, 1403 (Em.App., 1972). *See also* Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); University of Southern California v. CLC, 472 F.2d 1065, 1068 (Em. App., 1972), cert. denied, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973); United States v. International Brotherhood of Electrical Workers, 475 F.2d 1204 (Em.App., 1973).

Thus, we believe that the Power Commission was correct in finding, assuming that a finding was necessary, that CL&P's fuel clause was not changed and was at all times in conformance with Section 35.14 of the Power Commission's Regulations.[26] We agree with the trial court's finding that the Power Commission was correct in concluding, in Order

---

26. Since CL & P was able to meet the certification procedures of Order No. 437A–5, it was not required to file a new rate schedule pursuant to ordering paragraph (c) thereof.

437A–12, that CL&P's clause was consistent with the Economic Stabilization Act.[27]

To reiterate, we have analysed both alternatives, and hold that under either, the fuel adjustment clause became operational on November 14, 1971.

### III.

Finally, Cities argue that in approving the operation of the fuel adjustment clause, the Commission engaged in retroactive ratemaking. The trial court made no specific finding on this question. We do not reach this issue because we cannot. It is our view that an allegation of retroactive ratemaking raises issues under the Federal Power Act. *See, e. g.*, Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 254, 71 S.Ct. 692, 95 L.Ed. 912 (1951); FPC v. Sunray DX Oil Co., 391 U.S. 9, 24, 88 S.Ct. 1526, 20 L.Ed.2d 388 (1968). This court is not the proper forum to hear such issues. The law is clear that Power Commission orders which raise Economic Stabilization issues are exclusively reviewable in the District Court, with review in this court. Orders raising Federal Power Act [28] issues are exclusively reviewable in the Court of Appeals.

In Municipal Intervenors Group v. FPC, 153 U.S.App.D.C. 373, 473 F.2d 84 (1972) on *very* similar facts, the Court of Appeals dismissed petitions for review of Power Commission orders on the ground that the petitions raised only Economic Stabilization Act issues. There, the Power Commission had suspended certain gas rates which would have been effective but for Phase I. After the 90-day period the Commission entered orders permitting those rate increases to be effective as of November 14, 1971. The Court of Appeals held that Power Commission Order No. 437 was founded entirely upon the Economic Stabilization Act, Executive Order No. 11627 and Section 300.016 of the Price Commission's Regulations. 473 F.2d at 88. The Court of Appeals noted that "the circumstance that utilities are subject to two types of regulatory control raises the possibility of two types of judicial review." 473 F.2d at 90.

Subsequently, in Municipal Electric Utility Assoc. of Alabama v. FPC, 485 F.2d 967 (D.C.Cir. Nos. 72–1293, et al., decided June 29, 1973) the Court held that Economic Stabilization Act issues in a proceeding arising under the Federal Power Act were exclusively reviewable in the District Court, with appeal to this court. At 970–971. Clearly reaffirming *Municipal Intervenors*, the court stated:

> In *Municipal Intervenors Group* we stated: "The circumstances that utilities are subject to two types of regulatory control raises the possibility of two types of judicial review" [footnote omitted]. While both aspects of the Commission's regulatory jurisdiction are reflected in the order sought to be reviewed, the issues on appeal arising under the Federal Power Act may be cleanly severed from those that require consideration of the Economic Stabilization Act [footnote omitted]. We believe that *an entirely harmonious accommodation of the two pertinent Congressional enactments can be achieved by dual review of the Commission's order in both this court and the District Court, each tribunal acting within the sphere of its statutorily defined exclusive jurisdiction.*

At 970–971. (Emphasis added.)

Under this statutory system [29] of separate review for separate issues, Cities' allegation of retroactive ratemaking, raising Federal Power Act issues, cannot be heard in this court. Municipal Intervenors Group v. FPC, *supra*; Mu-

---

27. City of Groton v. FPC, Civil Action No. 56–73, 10 (D.D.C. July 9, 1973). J.A. at 76.

28. Also issues arising under the Natural Gas Act which the Commission administers.

29. *See* § 313 of the Federal Power Act, 16 U.S.C. 825*l* (1970) *and* § 211 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 (Supp. II, 1972).

**936**

nicipal Electric Utility Association of Alabama v. FPC, *supra*.

It was noted *supra* that Cities have already applied for review of Order No. 437A–12 to the Court of Appeals for the District of Columbia Circuit. This petition, alleging Federal Power Act issues, was dismissed. Connecticut Municipal Group v. FPC, (D.C.Cir. No. 72–7208, Order entered July 23, 1973). This brief order dismisses the petition for "lack of jurisdiction." For purposes of this appeal we need say only that this court has jurisdiction over only Economic Stabilization Act issues. We have exercised this jurisdiction, and find that the trial court was correct in its conclusion that the Power Commission, acting under authority delegated pursuant to the Economic Stabilization Act, violated no pertinent regulations when it issued Order No. 437A–12.

### IV.

For the reasons stated above, the opinion of the trial court is

Affirmed.