**SOHIO PETROLEUM COMPANY,**
**Plaintiff-Appellee,**

v.

**CARIBOU FOUR CORNERS, INC.,**
**Defendant-Appellant.**

**No. 10–12.**

Temporary Emergency Court of Appeals.

Argued Nov. 18, 1977.

Decided March 13, 1978.

Ronald C. Barker, Salt Lake City, Utah, was on the brief for defendant-appellant.

Douglas G. Madison, Dray & Madison, Cheyenne, Wyo., was on the brief for plaintiff-appellee.

Before CHRISTENSEN, INGRAHAM, and GRANT, Judges.

GRANT, Judge.

This case involves a dispute, within the limited facts of this case, over the applicability of the "stripper well exemption" to "natural gas liquids" (condensate) recovered from natural gas wells during the period November, 1973, to September, 1974. Appellant Caribou Four Corners, Inc., (Caribou), (1) challenges the application of the "stripper well exemption" to condensate produced from Sohio Petroleum Company's (Sohio) gas wells, and (2) contends that Sohio's invoices at the lower or controlled price during the period January through April, 1974, constituted a "posting" of the price, under the terms of the contract, which would preclude Sohio from claiming the additional premium price.

The parties stipulated the following facts: That on or about March 25, 1970, the parties entered into an agreement under the terms of which Caribou agreed to purchase all of the "crude oil or condensate" produced from Sohio's properties in the Lost Cabin Creek-Madden Field in Fremont County, Wyoming.

Under the agreement, Caribou agreed to pay Sohio's "posted well price" for each barrel sold and delivered. For some three and one-half years, the parties operated under those terms without controversy. During all of that period, the price of crude oil was subject to control under Phase IV of the Economic Stabilization Act of 1970.[1] However, on November 27, 1973, the Emergency Petroleum Allocation Act of 1973[2] (EPAA) was enacted. Section 4(e)(2)(A) of that Act exempted from price controls the first sale of crude oil from any lease of which the average daily production of crude oil did not exceed ten barrels per well.[3] This "stripper well" exemption continued in effect until well after the suspension of trading between these parties.

Following the passage of this exemption, Sohio began invoicing Caribou at the uncontrolled, or "premium price", as it was re-

---

1. 12 U.S.C. § 1904 note.

2. 15 U.S.C. § 751–760.

3. 15 U.S.C. § 753(e)(2)(A). Subsection (e) was repealed effective February 1, 1976, by P.L. 94–163.

ferred to in the industry. For the months of November and December, 1973, Sohio invoiced Caribou at that premium or uncontrolled price and Caribou paid those invoices without protest to Sohio.

However, during the first four months of 1974, due to what Sohio claims to have been inadvertence resulting from Sohio's conversion to a new accounting and billing system, Sohio billed Caribou at the lower or controlled price. This "inadvertence" was discovered by Sohio in May and thereupon Sohio billed Caribou for $38,540.40, representing the difference between the controlled price and the uncontrolled price for the condensate which had been delivered during the four-month period, January through April. Caribou refused to pay this billing.

Thereafter, for the next five months, through September, 1974, Sohio again billed Caribou at the premium price, which billings were paid by Caribou and, again, were paid without communicating to Sohio any disagreement with the premium price charged. Sohio ceased operation of the gas wells in this Field in October 1974, after which those wells were operated by Inexco Oil Company. Caribou continued the payment of premium prices to Inexco Oil Company for condensate for two years thereafter or until December, 1976.

Thereafter, on May 14, 1976, Sohio brought this contract action seeking recovery of the sum of $38,540.40, representing their alleged under-billing for the four-month period, January through April, 1974. Caribou denied liability and counter-claimed in the sum of $62,266.13, representing a claimed refund of the "premium price" or excess payment which they contend was erroneously billed, for the reason that inasmuch as the condensate was all produced from gas wells, which produced no crude oil, it follows that the stripper well exemption was not applicable and, consequently, Sohio could not lawfully charge the "premium" price.

As an additional issue, Caribou claims that inasmuch as the contract between the parties fixes the price for the condensate at Sohio's "posted price", Sohio, in effect, "posted" the price by billing Caribou during that interval of four months, and cannot now claim a higher price, so that Sohio should be estopped from asserting a claim for the higher price.

Following trial, the district court issued its findings of fact and conclusions of law and entered judgment for Sohio in the sum of $38,540.40, together with interest, and dismissed the counter-claim of Caribou. We affirm.

■ During oral argument this Court, *sua sponte,* raised the question of jurisdiction of this Temporary Emergency Court of Appeals to hear this appeal. It was noted that plaintiff's complaint was clearly an action on a contract with jurisdiction allegedly based solely on diversity of the parties. However, defendant-appellant, by its answer, put in issue the applicability of the EPAA (and particularly the stripper well exemption), and "regulations or orders issued thereunder". Appellant's . counter-claim clearly involved an interpretation of FEA's regulations and orders and of this Court's decisions with respect to those Federal Energy Laws.

This Court was created by Congress in the Economic Stabilization Act of 1970, 12 U.S.C. § 1904 note. Section 211(b)(2) of that Act read as follows:

(2) Except as otherwise provided in this section, the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies *arising under* this title or under regulations or orders issued thereunder. . . . (Emphasis added.)[4]

The Supreme Court, in *Bray v. United States,* 423 U.S. 73, 74, 96 S.Ct. 307, 46 L.Ed.2d 215, in considering the rationale behind the granting of exclusive jurisdiction to TECA stated:

4. Section 5(a)(1) of the Emergency Petroleum Allocation Act of 1973, incorporates by reference Sections 205–211 of the Economic Stabili-

zation Act of 1970, as amended, thus continuing the quoted "exclusive jurisdiction" of this Court ↟under the EPAA.

As part of the Economic Stabilization Act Amendments of 1971, Congress created the Temporary Emergency Court of Appeals (TECA) and vested it with 'exclusive jurisdiction of all appeals from the District Courts of the United States in cases and controversies arising under this title or regulations or orders issued thereunder.' § 211(b)(2), 85 Stat. 749. This judicial review provision was designed to provide speedy resolution of cases brought under the Act and 'to funnel into one court all of the appeals arising out of the District Courts and thus gain in consistency of decision.' (Citation omitted.)

The District Court in this case made extensive findings of fact on issues arising out of its interpretation of the stripper well exemption, as applied to the facts of this case. Following final argument, Caribou submitted proposed findings of fact, including its No. 3 which proposed that the Court should find that jurisdiction "is based upon diversity of citizenship under the provisions of 28 U.S.C. § 1332 and 15 U.S.C. § 766(i)(2)(B). The able District Judge, having heard the evidence, and with knowledge of the issues involved, and having the guidance of Rule 15(b), F.R.C.P., did thereupon find that "the jurisdiction of this Court is based upon diversity of citizenship under the provisions of 28 U.S.C. § 1332 *and* the provisions of 15 U.S.C. § 766(i)(2)(B)." (Emphasis supplied.) We hold, under the circumstances here presented, that this is a case "arising under" the EPAA, and its progeny, and regulations issued thereunder and, consequently, that appellate jurisdiction is properly vested in this Court.

*The Stripper Well Exemption*

The stripper well exemption was created in the EPAA. Section 4(e)(2)(A) of that Act read as follows:

The regulation promulgated under subsection (a) of this section shall not apply to the first sale of crude oil produced in the United States from any lease whose average daily production of crude oil for the preceding calendar year does not exceed ten barrels per well.

In the case before us, the District Court found (Finding No. 9):

That the practice of a majority of producers in the oil and gas industry prior to issuance of FEA Ruling 1974–28 was that crude oil condensate produced from gas wells qualified for the stripper well lease exemption.

That broad, but as yet undefined, industry interpretation of the scope of the stripper well exemption continued until the effective date of FEA Ruling 1974–28 (i. e., January 1, 1975), when, at such time, the FEA, for valid reasons well enunciated in its subsequent review and Ruling of September 1975, reaffirmed its 1974–28 Ruling and determined that henceforth, in order to terminate the great uncertainty that existed in the industry, the stripper well exemption would be limited to condensate produced from oil wells.

FEA's Ruling 1974–28 was issued December 24, 1974, some three months after Sohio stopped operating the leases and selling to Caribou. The effect of that Ruling was to remove crude oil condensate thereafter produced from gas wells from the stripper well lease exemption. Because of the many adverse comments from people in the gas well field, the FEA re-opened formal rule-making proceedings on the applicability of the stripper well exemption to condensate produced from gas wells. Following that re-opened procedure, the FEA announced:

The F.E.A. is aware that before the issuance of Ruling 1974–28 there was considerable uncertainty with respect to whether the stripper well lease exemption was applicable to the production of condensate from gas wells, and that those who did treat gas-well condensate as qualifying for the stripper well lease exemption, did so in the good faith belief that this was permitted under F.E.A. regulations. As a general matter F.E.A. Rulings are to be regarded merely as publication of the formal interpretation that the F.E.A. has always placed upon its regulations since their inception. *However, because of producers' good faith treatment of gas-well condensate as*

*eligible for the stripper well lease exemption prior to the issuance of Ruling 1974–28,. with respect to the treatment of gas-well condensate for purposes of the stripper well lease exemption the Ruling will be effective January 1, 1975, and the regulations will be enforced pursuant to the interpretation rendered in Ruling 1974–28 prospectively-only from that date. . . .* 40 Fed.Reg. 40818 (September 4, 1975) at 40820. (Emphasis added.)

In recent cases before this Court, we have carefully and thoroughly reviewed the authority of the Federal Energy Administration (FEA) to regulate the allocation and pricing of natural gas liquids recovered from gas wells. In our most recent case, *Southern Union Production Company, et al. v. FEA*,[5] we reviewed those decisions and affirmed the judgment of that District Court in upholding the FEA's stripper well regulations as "founded upon a rational economic basis and supported by both logic and legislative history."

■ Caribou here contends that the September 1975 Ruling by FEA created, *retroactively*, a new exemption for gas well condensate from price controls. The clear answer to that is that the stripper well exemption was created by Congress in the EPAA, not by the Agency. Prior to Ruling 1974–28 § 4(e)(2)(A) of the EPAA and the regulations promulgated thereunder were silent with respect to the scope of that exemption, i. e., whether gas well condensate was or was not included in the exemption. As noted above, the FEA, in its September 1975 Ruling, recognized

. . . that before the issuance of Ruling 1974–28 there was considerable uncertainty with respect to whether the stripper well lease exemption was applicable to the production of condensate produced from gas wells, and that those who did treat gas well condensate as qualifying for the stripper well lease exemption did so in the good faith belief that this was permitted under FEA regulations.

And we note here that the District Court, in the case before us, specifically found (Finding No. 18) that:

Sohio has acted in good faith at all times with respect to this controversy.

Notwithstanding the practice which prevailed in the industry of including gas well condensate in the stripper well exemptions provided in the statutes, Caribou now contends that it relies upon FEA's subsequent interpretation as enunciated in Ruling 1974–28, and subsequent rulings, to support its argument that gas well condensate was never within the statutory exemption. However, we must view this case in the light of the situation existing during the period from November 1973 to September 1974. Ruling 1974–28 did not come into existence until three months after the parties stopped dealing with each other. Thus, Caribou asserts a defense that did not even exist at the time of these transactions. When those FEA rulings were subsequently promulgated, it was expressly stated that their application to gas well condensate should be prospective only. We hold that there is no issue of retroactivity here involved.

In the agency case of *Edminston Oil Company v. FEA*,[6] an audit had revealed that *Edminston* (as in the case before us) had charged premium prices on crude oil condensate produced from gas wells prior to January 1, 1975. At first, FEA ordered *Edminston* to refund these "overpayments" but, following the 1974–28 Ruling, FEA reversed its position and determined that Ruling 1974–28 was inapplicable to sales made before January 1, 1975.

■ In the case before us, Caribou further contends that it reasonably changed its position to its detriment in reliance upon the amounts billed during that four-month period and that Sohio should now be estopped to claim the higher price. It is,

---

5. No. 5–26, Temp.Emer.Ct.App. (Em.App.) 569 F.2d 1147, 1978.

6. *Edminston Oil Company v. FEA*, Case No. FEE–2115, filed Dec. 19, 1975, decided March 17, 1976.

however, restated here that both before and after those four months of January, February, March and April, 1974, when according to the District Court's Finding No. 12:

> . . . due to error and inadvertence on the part of Sohio occasioned by the inauguration of a new accounting and billing system Sohio did not invoice Caribou for the . . . premium price
>
> . . . . .

Caribou paid, and later resumed payment, of Sohio's invoices at the higher or premium price, and did so without protest to Sohio during any of the time that the dealings between these parties continued.

In *California, et al. v. Simon,*[7] we were presented with the question "whether the Federal Energy Office (FEO) had already terminated a rule making proceeding initiated by its predecessor, the Cost of Living Council (CLC), when it rescinded the state and local government exemption of price controls in reliance upon, and effective as of the date of, the CLC's original rule making notice contemplating such action." Appellee Simon, in that case, contended that they had justifiably relied upon FEO's reiteration of the exemption as an assurance that the rule-making proceeding had been terminated favorably to them, that subsequent removal of the exemption deprived them of fair opportunity to make current comment and that they were led into an injurious change of position. In rejecting appellant's defense of reliance, we stated there:

> . . . appellee's claim of good faith reliance takes on a somewhat hollow, if not artful, sound in view of information elicited during oral argument that at no time prior to actual withdrawal of the exemption did any of them so much as inquire of the agency whether the rule-making proceeding looking toward the withdrawal of the exemption had, in fact, been abandoned. At page 438.

We apply our quoted language from *California* to the reliance issue before us. Good faith reliance here would have certainly demanded a protest to Sohio of the invoices at premium prices of November and December, 1973, and again in May, June, July, August or September 1974.[8] The failure here to do so takes on that same "hollow sound" we spoke of in *California.*

■ After challenging FEA's authority to regulate the allocation and pricing of natural gas liquids recovered from gas wells, which challenge we have previously rejected in *Southern Union Production Company, supra,* Caribou placed its principal reliance on (1) the issue of retroactivity, which we have considered above and rejected, and (2) on the alleged failure of FEA to comply with certain statutory requirements "in retroactively exempting condensate produced from gas wells in 1973 and 1974 from price controls." Specifically, appellant contends that the September 1975 Ruling is invalid for a failure to comply with the provisions of Subsections 4(f)(2)(B)[9] and 4(g)(2)[10] of the EPAA.

Subsection 4(f)(2) applies to the President's authority to delay, for not more than 30 days, the effective date of the regulations mandated by the Allocation Act, in the event that he should find that delay is in the public interest. Subsection 4(g)(2), however, applies to the creation of new exemptions after enactment of the Act, if the President finds that regulation of crude oil, etc., "is not necessary to carry out this Act, that there is no shortage of such oil, etc." The procedure under Subsection 4(g)(2) did require[11] that such proposed amendment be submitted to each House of Congress, etc., but such procedural requirements are inapplicable to the facts of the case here before us. The FEA did not here

---

7.   504 F.2d 430. (Em.App.1974).

8.   Evidence was adduced at the trial indicating that it was not until April, 1975, that Caribou first indicated that the $38,540.40 had not been paid for the reason that Caribou challenged the applicability of the stripper well exemption to this gas well condensate.

9.   Now redesignated as Section 4(d)(2)(B) by Public Law 94–163.

10.   Subsection 4(g)(2) was repealed Feb. 1, 1976, by Public Law 94–163.

11.   See Footnote 10.

create a new exemption by its September 1975 Ruling. It merely announced its interpretation of an old exemption which had been created by Congress.[12] And as a part of that announcement, for the many valid reasons set forth therein, FEA had determined that its interpretation and application of that *old* exemption, created by the Congress, would be *prospective* only as of the date of the promulgation of the first Ruling (1974-28), i. e., January 1, 1975. It follows that both Subsections 4(f)(2)(B) and 4(g)(2) are inapposite to the facts of the case before us.

*Posted Well Price*

██ The contract between the parties obligated Caribou to buy the entire production of condensate from Sohio's field at Sohio's "posted well price." Caribou contends that there were no prices posted in the gas field and that the only notification received by Caribou of the "posted price" being charged by Sohio was by way of the monthly invoices sent by Sohio to Caribou. Caribou then argues that, by billing Caribou for the lower or "controlled" prices during the January through April 1974 period, Sohio thereby "posted" that lower price within the meaning of the contract.

However, the District Court found (Finding No. 11):

> that Caribou received pricing schedules for Sohio and was aware of the prices it was being charged.

Caribou has admitted that it was billed and that it paid the "premium" price at the outset of the contract, i. e., the months of November and December, 1973. If Caribou's argument is valid, then its first billings at the "premium" price certainly constituted a posting of the "premium" price at the inception of the contract. It appears more than a bit incongruous for Caribou to now argue that such invoices constituted "posting" only during the interval of four months here at issue. Did they not resume the payment of invoices at "premium" prices in May 1974 after the billings were corrected? Caribou's argument here smacks of that same "hollow sound" we commented on above.

██ Finally, we would not close this opinion without reference to and additional reliance upon the "great deference rule" we discussed at some length in *Pasco, Inc. v. FEA*,[13] wherein we said:

> The review of administrative determinations of exceptions from the complex programs necessary to deal with the petroleum industry and the determination of administrative appeals therefrom requires special attention to the 'great deference rule' discussed above. Administrative decisions based upon analysis of the data and information submitted on application for exception relief require the application of administrative expertise, and this court should not be quick to overturn them. At page 1404.

Where, as here, the Agency has acted within its jurisdiction and in the exercise of its delegated duties, we find nothing to suggest that we overturn the Agency action on the basis of the facts before us. We hold again that FEA's stripper well regulations were founded on a rational economic basis and are supported by both logic and legislative history. The Judgment entered by the District Court for the plaintiff-appellee, Sohio, and dismissing Caribou's counter-claim is affirmed.

AFFIRMED.

INGRAHAM, Judge, concurring specially:

I join in the decision of the majority to affirm the judgment of the district court. On the issue concerning retroactivity of Ruling 1974-28, however, I would do so on different grounds. The majority holds that Caribou cannot assert retroactivity as a defense because the defense did not exist at

---

**12.** Congress created the stripper well exemption by another Subsection of the Act (4(e)(2)(A)) and for another and entirely different reason, i. e., to encourage production from small marginal wells to augment the nation's supply of oil.

**13.** 525 F.2d at 1391. (Em.App.1975).

the time of the transaction between the parties. I would instead recognize Caribou's position as a colorable defense, but would hold that the FEA action is valid in this case.

In order to understand the difference between my position and the majority's, it is necessary to first explicate Caribou's argument. Caribou contends that the stripper well exemption was never intended to exempt condensate produced from gas wells, and that therefore, after the date of its passage, all condensate produced from these wells should have been sold at a controlled price. Caribou makes this contention in spite of the fact that until the passage of Ruling 1974–28, the commercial practice in the industry was to sell gas well condensate at the "premium price." This industry practice ended with the promulgation of Ruling 1974–28 which required this condensate to be sold at the controlled price.

In September 1975, the FEA decided that Ruling 1974–28 would only be applied prospectively. The effect of this 1975 change, according to Caribou, was to legitimate those sales of gas well condensate at "premium prices" which had occurred from the time of the passage of the stripper well exemption until the time of the promulgation of Ruling 1974–28. Therefore, by sanctioning "premium prices" for this period in the face of Congressional intent that these prices be controlled, the 1975 change retroactively changed the law for this period.

The essence of the majority analysis is that Caribou cannot assert retroactivity as a defense because the challenged FEA action, Ruling 1974–28, was promulgated subsequent to the transactions between the two parties. Therefore, Caribou asserts a defense that did not exist at the time of these transactions.

I believe instead that Caribou argues that Ruling 1974–28, in stating that the exemption applied only to oil well condensate, merely clarified, but did not change the law. From this perspective, the September 1975 amendment was, in effect, a decision to not enforce the law until 1975. As such, the September 1975 ruling pulled the rug out from under Caribou by eliminating its defense to Sohio's contract claim. The real issue in this case, then, centers around the validity of the 1975 ruling. The validity of this ruling is legitimately challenged regardless of the fact that it was handed down after all dealings between the companies had ended.

Though I agree that the validity of the September 1975 ruling is properly contested in the present proceeding, I cannot agree that it is subject to challenge on grounds of retroactivity. The September 1975 ruling seeks a prospective, not retroactive, application of Ruling 1974–28. Ironically, the result which Caribou advocates is in itself a retroactive application of Ruling 1974–28.

The real issue in this case is whether the FEA had the authority to issue a ruling prospectively when the effect of the ruling was to change, retroactively, the "true intent" of a statute of Congress. Caribou argues that Congress intended for the exemption to apply only to oil wells and that the exemption should have been so applied from its inception. I agree that if the meaning of the statute was clear, the FEA would have had no power to take gas well condensate from the exemption without complying with § 753(g)(2), for to do so would have rendered the 1975 ruling invalid. The principal defect of this course of action would not be a retroactive change of the statute, so much as the failure of the FEA to conform to the statutory scheme created by Congress.

The weakness of Caribou's argument finally rests with the fact that it is impossible to fathom the "true intent" of the stripper well exemption. The provision is ambiguous on its face for it exempts crude oil produced "from any lease." 15 U.S.C. § 753(e)(2)(A) (Supp.1975). The statute does not define the key words such as "crude oil" and "lease." Therefore, it is impossible to tell whether the statute applies to gas well leases.

I would hold that because the statute is unclear, it was the province of the FEA to interpret the scope of the stripper well lease exemption created by Congress. In so do-

ing it was natural for the FEA to seek out the intent of the drafters of the Act. The FEA believed that Congress had intended the exemption to apply only to oil wells. The fact that the FEA based Ruling 1974–28 upon this perception did not of itself vitiate the agency's power to choose whether to enforce the ruling retroactively or prospectively only.

It is clear that an agency has the power to enforce its decision prospectively. *Lodges 743 and 1746 v. United Aircraft Corp.*, 534 F.2d 422, 452–53 (2d Cir. 1975); *NLRB v. Q–T Shoe Manufacturing Co.*, 409 F.2d 1247, 1250–52 (3d Cir. 1969); *Joseph v. FCC*, 131 U.S.App.D.C. 207, 212, 404 F.2d 207, 212 (1968). In fact, courts have examined more closely those agency decisions given retroactive effect because of the increased likelihood of these rulings to unduly prejudice a party. *NLRB v. Q–T Shoe Manufacturing Co., supra*, 409 F.2d 1252.

The decision of whether retroactively to apply a newly adopted administrative rule rests within the sound discretion of the agency, after considering the following factors:

> (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite reliance of a party on the old standard.

*Retail, Wholesale and Department Store Union v. NLRB,* 151 U.S.App.D.C. 209, 219, 466 F.2d 380, 390 (1972). I see no reason why a different standard should govern the decision of the FEA to enforce its interpretation of the stripper well exemption only prospectively.* I would hold that the FEA did not abuse its discretion in making this decision and that the September 1975 ruling is therefore valid.

I concur in the result.

---

* Most of the cases dealing with the power of an agency to enforce a ruling prospectively deal with legislative rulemaking instead of the interpretative rulemaking involved in this case. For this reason, there is a dearth of case law on the precise question presented in this appeal—the validity of a prospective interpretative rule. One leading commentor on administrative law argues that an agency should have the power to limit an interpretative ruling to prospective effect. See K. Davis, 1 Administrative Law 353 (1958). He also describes one instance where this power was utilized. In 1938, the Wage and Hour Administrator of the Fair Labor Standards Act issued an interpretative bulletin

which stated that the Act was not meant to cover plants where the employees worked on raw materials derived from within the state and where none of the products of the plant moved in interstate commerce. Subsequently, two court decisions, *Chapman v. Home Ice Co.,* 136 F.2d 353 (6th Cir. 1943) and *Hamlet Ice Co. v. Fleming,* 127 F.2d 165 (4th Cir.), *cert. denied,* 317 U.S. 634, 63 S.Ct. 29, 87 L.Ed. 511 (1942), held that the Act covered these plants. The Administrator accordingly amended his interpretative bulletin to comply with the decision but expressly provided that the amendment would apply only after a specified future date. See Davis, *supra.*