**In re the DEPARTMENT OF ENERGY STRIPPER WELL EXEMPTION LITIGATION.**

**UNITED STATES DEPARTMENT OF ENERGY, et al., Appellants,**

v.

**"THE STATES", Appellees.**

**TECA No. 10–73.**

Temporary Emergency Court of Appeals.

Argued May 4, 1988.

Decided July 20, 1988.

Stephen C. Skubel, with whom Marc Johnston, Office of General Counsel, U.S. Dept. of Energy, Washington, D.C., and Theodore A. Miles, Marcia K. Sowles, and Floyd I. Robinson, Economic Regulatory Admin., U.S. Dept. of Energy, Washington, D.C., were on the brief, for appellants.

Bernard Nash, with whom Edward G. Modell and Eileen P. Shannon, Nash, Railsback & Plesser, Washington, D.C., Andrew P. Miller, Milton B. Whitfield, J. Bradley Ortins, Dickstein, Shapiro & Morin, Neil F. Hartigan, Atty. Gen., and Michael Hayes, Deputy Atty. Gen., Chicago, Ill., Dave Frohnmayer, Atty. Gen., and Donald C. Arnold, Chief Counsel, Dept. of Justice, Salem, Or., Leroy S. Zimmerman, Atty. Gen., Eugene F. Waye and Kathleen Misturak–Gingrich, Deputy Attys. Gen., Harrisburg, Pa., James F. Flug and Paula Dinerstein, Lobel, Novins, Lamont & Flug, Washington, D.C., and John Van de Kamp, Atty., and Yeoryios C. Apallas, Deputy Atty. Gen., San Francisco, Cal., were on the brief, for appellees.

Before GRANT, METZNER and PECK, Judges.

JOHN W. PECK, Judge.

This appeal concerns whether the district court properly interpreted the Final Settlement Agreement approved in *In re Department of Energy Stripper Well Exemption Litigation,* 653 F.Supp. 108 (D.Kan.1986), as requiring the Department of Energy to credit retroactively the entitlements exception receive order payments authorized prior to the effective date of the Agreement

before it could receive its share of the settlement proceeds.

## I.

During the existence of petroleum price and allocation controls, the Federal Energy Administration (FEA), later the Department of Energy (DOE), adopted the Entitlements Program so that all refiners and marketers shared equally in the benefits of price-controlled crude oil and in the burdens of uncontrolled crude oil.[1] The major oil companies had greater access to the cheaper, price-controlled oil than did the small and independent refiners. As a part of the Entitlements Program, 10 C.F.R. 211.67, a firm could request and obtain exception relief from the DOE and its predecessors when a regulation imposed a special hardship, inequity or unfair distribution of burdens on the firm. The Entitlements Program attempted to deal with this inequity by requiring refiners with proportionally greater access to cheaper, price-controlled oil to make cash payments, in the form of the purchase of entitlements, to refiners with less access to price-controlled oil. The Office of Hearing Appeals (OHA) generally facilitated entitlements exception relief by directing that appropriate adjustments be made to a firm's obligations under future entitlements lists. *See, e.g., Delta Refining Co.,* 2 FEA ¶ 83,078 (1975).

Although allocation and price controls were terminated as of January 28, 1981, a number of entitlements exception relief orders were outstanding and other applications for relief were still pending at that time. DOE was faced with the question of whether to continue to issue entitlements lists and, if not, whether and how to implement outstanding orders and pending applications for entitlements exception relief.

The OHA continued to process exception claims until June 28, 1984, when DOE issued a final decision that the public interest would be best served if DOE did not issue any further entitlements notices. 49 Fed. Reg. 27410 (1984). *See Texaco, Inc. v. DOE,* 795 F.2d 1021 (Temp.Emer.Ct.App.), *cert. dismissed,* 478 U.S. 1030, 107 S.Ct. 10, 92 L.Ed.2d 766 (1986) (after challenges by some refiners, the DOE's decision was upheld by this court; petition for certiorari was dismissed pursuant to the Final Settlement Agreement in the Stripper Well case). The DOE then announced that it would hold a proceeding concerning the treatment of outstanding entitlements exception "receive orders". Subsequently after notice and comment, OHA announced that it would pay final adjudicated entitlements receive orders from crude oil overcharge funds that it held in escrow. 50 Fed.Reg. 27402 (1985).

On October 2, 1985, the OHA began issuing Orders approving the payments of receive orders. Although OHA's Order did not authorize immediate payment to those firms, it directed the establishment of interest-bearing accounts within the DOE Deposit Fund Escrow Account in the name of each applicant. *See Amber Refining, Inc.,* 13 DOE ¶ 85,217 (October 2, 1985). Between December 14, 1985 and June 16, 1986 approximately $73 million was paid to sixteen firms holding receive orders. This amount was paid out of the crude oil overcharge escrow account and it is this amount which is at issue in this appeal.

During this same approximate time period, and beginning December 1, 1985, the DOE entered into settlement negotiations with the States in the Stripper Well Exemption Litigation through its chief negotiator, Avrom Landesman. At all times Landesman represented to the States that DOE would be responsible for funding the entitlements exception relief receive orders. On January 23, 1986, Landesman and Marshall Staunton, then Acting Administrator of the Economic Regulatory Administration, executed a Memorandum of Understanding along with the States' Negotiating Committee and many other parties to the Stripper Well litigation. Record at

---

1. For a detailed discussion of the entitlements program, see, e.g., *Texaco, Inc. v. DOE,* 795 F.2d 1021 (Temp.Emer.Ct.App.1986), *cert. dismissed,* 478 U.S. 1030, 107 S.Ct. 10, 92 L.Ed.2d 766 (1986); *Cities Service Co. v. FEA,* 529 F.2d 1016 (Temp.Emer.Ct.App.1975), *cert. denied,* 426 U.S. 947, 96 S.Ct. 3166, 49 L.Ed.2d 1184 (1976); *Pasco, Inc. v. FEA,* 525 F.2d 1391 (Temp.Emer.Ct. App.1975).

325–27. Paragraph II.10 of the Memorandum of Understanding states as follows:

[T]he Settlement Agreement shall specifically exclude any and all claims or adjudications for payment to applicants for exception relief from the crude oil Entitlements Program which have been or may be granted by the DOE's Office of Hearings and Appeals, the Federal Energy Regulatory Commission, or any Court. *DOE agrees to provide all funds necessary to fund such relief out of its share of funds under the Settlement Agreement or funds not otherwise restricted by that Agreement* and DOE's obligations shall not affect the amount or timing of payment to any party made pursuant to the Settlement Agreement. (emphasis added)

The agreement between DOE and the States concerning DOE's responsibility to provide all funds to pay entitlements exception relief receive orders was carried forward and incorporated into Paragraph V.G of the Final Settlement Agreement of the Stripper Well Exemption Litigation (the Agreement) that was completed on March 21, 1986, which states as follows:

G. *Preservation of Entitlements Claims.* This Agreement specifically excludes and preserves *any and all claims* by a Refiner applicant against DOE *for payment by DOE of (i) exception relief* from the crude oil Entitlements Program including, but not limited to, exceptions or adjustments based on or pursuant to Delta/Beacon or Naptha Entitlements relief, which has been or may be granted by the ERA, OHA, the Federal Energy Regulatory Commission, or any court or (ii) any adjustments or changes to the draft January 1981 Notice or Entitlements Adjustment Notice. This Agreement also specifically excludes any and all claims by a Refiner against DOE for interest on such adjustment or change or exception relief and for attorneys' fees and costs incurred in connection with such relief. *DOE agrees to provide all funds necessary to fund and pay all amounts determined to be due any Refiner pursuant to* or as a result of *any such adjustments* or changes or relief

including such interest and attorneys' fees, if awarded, *out of its share of funds under this Agreement,* or out of funds (other than funds resulting from violations or alleged violations except Alleged Crude Oil Violations) to which no other Party has a claim by virtue of this Agreement. DOE's obligations shall not affect the amount or timing of any payment to any other Party made pursuant to this Agreement. (emphasis added)

The entire Agreement was subject to modification during the review process, but no changes were made to Paragraph V.G. On June 16, 1986 a proposed order approving the Final Settlement Agreement was submitted to the district court by the liaison counsel for the Refiners "on behalf of all parties to the Settlement Agreement." Record at 334–35. This proposed order included the following language in one of its provisions:

IT IS FURTHER ORDERED that all entitlements exception relief paid by DOE after December 1, 1985, shall be deemed to be available for distribution in calculating the amount to be distributed to the States under Paragraph IV.B. of the Agreement, and shall be deemed to be funds received or retained by DOE under the Agreement.

This proposed order was not incorporated into the district court's opinion approving the Agreement on July 7, 1986. The court did not address any of the specifics concerning the entitlements exception relief orders.

In an August 4, 1986 Decision and Order of the Department of Energy, Record at 341, the DOE stated that it would be obligated to fund those receive orders which had not been paid at the time the Settlement was approved. The DOE did not dispute the fact that those payments made after the Agreement was finalized would be made from DOE's share of the Settlement funds. On October 30, 1986, the States filed a motion with the district court to enforce what the States alleged were DOE's obligations under Paragraph V.G. The DOE filed its opposition to the States' motion. After hearing oral argument and

examining the extrinsic evidence presented by affidavits and deposition testimony, the district court issued its Opinion and Order granting the States' motion. The court found that the language of Paragraph V.G is "clear" and exhibits "a specific intent that DOE's obligation operate retroactively." The court held that the Agreement by its very terms states that DOE should provide all funds for all entitlements exception relief receive orders, including funds for payments which were made by DOE out of the escrow account and prior to the district court's approval of the Agreement. Even though the court determined that Paragraph V.G is unambiguous, it found that, if it were to "examine the outside circumstances ... the circumstances would do nothing other than bolster the States' interpretation."

DOE now brings this appeal contending that the district court improperly construed Paragraph V.G of the Final Settlement Agreement. For the reasons stated below we affirm the order of the district court.

## II.

■ Our review of the district court's interpretation of the language of Paragraph V.G of the Settlement is functionally comparable to a review of a district court's contract interpretation. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975) (finding that "since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts"). We will consider the issue *de novo* as a matter of law. *See Eaton v. Courtaulds of North America, Inc.,* 578 F.2d 87, 90 (5th Cir. 1978) (review of language of a consent decree is not restricted by clearly erroneous rule and may be considered "afresh"). We disagree with the district court's determination that the language found in Paragraph V.G is "clear" and "susceptible of but one interpretation." We find, rather, that the language is ambiguous and its intent uncertain in some respects.

A significant factor causing confusion in the interpretation of this paragraph is the use of references to "claims," particularly in the first sentence which states that the Agreement preserves any and all *claims* which have been or may be granted. This sentence could be interpreted as a designation of outstanding or authorized claims being preserved, not necessarily claims that have already been satisfied or paid. This paragraph does not specifically indicate that it includes previously paid claims or that those satisfied claims would be subtracted from DOE Settlement monies. The third sentence of Paragraph V.G states that the "DOE agrees to ... pay all amounts determined to be due." This sentence is also unclear in that it relates to amounts *due,* but is not necessarily inclusive of amounts *paid.*

Because of the absence of a retroactive effective date, which would have significantly added clarity to this paragraph, and in light of the absence of a specific reference to the treatment of previously paid claims, we find that the language in Paragraph V.G of the Agreement is ambiguous. We accordingly must consider extrinsic evidence in order to determine the intent of the parties. *See ITT Continental Baking Co., supra* 420 at 238, 95 S.Ct. at 935; *Boatmen's Nat'l Bank of St. Louis v. Smith,* 835 F.2d 1200, 1202 (7th Cir.1987).

## III.

■ Two factors most certainly contribute to the ambiguity of Paragraph V.G. First is the sheer complexity of the Final Settlement Agreement of the Stripper Well Exemption Litigation, No. MDL 378, which involves hundreds of parties and the distribution of over one billion dollars. Second and perhaps more consequential is the fact that negotiations toward settlement and the payment of receive orders occurred almost contemporaneously. The first payment of the receive orders was made on December 16, 1985, just weeks after the settlement negotiations began.[2] After just

---

**2.** *See Navajo Refining, Inc. et al.,* 13 DOE ¶ 85,340 (December 16, 1985) (directing the pay-

ment of four claims totalling $18,368,638, which included interest from October 2, 1985 through

the one payment was made and before the bulk of the entitlements exception receive orders were issued, the Memorandum of Understanding was executed. Following the second ordered payment, the Settlement Agreement was completed and ready for review in March 1986. During the subsequent two months, the Agreement was apparently subject to high level review at DOE, but no changes were made specifically to Paragraph V.G. Two more payments of claims were ordered to be made during those two months, from the time the Settlement Agreement was drafted in March until it was executed by the parties in May. As stated by Richard Williams, negotiator for the Airlines, the parties were negotiating "a moving target." It appears that the process of negotiating a settlement continued without specifically addressing the treatment of the receive orders that were being paid simultaneously.

In order to properly construe the meaning of the language of Paragraph V.G, we turn to the extrinsic evidence offered by the States and the Department of Energy. First, the States argue that their documents demonstrate that at all times leading up to the court's approval of the Agreement all parties intended that DOE's obligation for payment of receive orders should be retroactive as well as prospective. The States support this position with extensive deposition testimony from Avrom Landesman and an affidavit of Richard T. Williams, who participated on behalf of the Airlines in the Settlement Agreement negotiations.

Mr. Landesman testified in deposition that from the time of the first negotiation meetings in Biloxi, Mississippi in early December of 1985 he made the following representation to the States: "[A]lthough there was to be a 50–50 split between the States and the United States of residual overcharge funds, the States would not bear any responsibility for the payment of

receive order relief." Record at 577. Landesman then gave the following illustration of what the DOE's position was concerning payment of the receive orders:

If there was a billion dollars in crude oil overcharge funds and all the other claimants were to be paid $200 million that would leave $800 million for the residue.

Under the 50–50 split formula, that would mean that DOE and the States would each get $400 million, but since there was an outstanding obligation to pay receive orders, say, of $100 million, for example, if the split occurred before the payment was made, then the States would not be participating in the payment of those receive orders.

If, on the other hand, the receive order of $100 million payment was made off the top, then in essence the remainder would be decreased by half of the hundred million dollars payment to the States and, in effect, or indirectly, the States would be participating in the payment of the receive order obligations.

*Id.* Landesman further stated that the DOE represented to the States that it would assume the entire burden of receive order payments in order to facilitate an end to a dispute that DOE was having with the refiners. Landesman testified:

The case had already been argued and in an effort to settle that matter amicably with the refiner industry, it was our view, meaning Mr. Staunton and myself, that it would be much easier to settle that matter with the oil industry if the States were uninvolved in the outcome of that matter.

Towards that end, in an effort to neutralize any position that the States might have with respect to the entitlement program, the proposal was made to insulate them from any financial burden with respect to any aspect of the entitlement

the date of payment); *Consumers Power Co.,* 14 DOE ¶ 85,030 (February 19, 1986) (directing the payment of one claim for $23,688,510, which included interest from October 2, 1985 through the date of payment); *Placid Refining Co., et al.,* 14 DOE ¶ 85,111 (March 31, 1986) (directing the

payment of ten claims totalling $29,393,974, plus interest from February 12, 1986 through the date of payment); *Caribou Four Corners, Inc.,* 14 DOE ¶ 296 (June 20, 1986) (directing the payment of one claim for $2,134,006, without any interest).

program, including the receive order issue.

Record at 578–79. Landesman relates that he was in daily communication with Staunton during the first two months of the negotiation period, advising him about the status of the settlement negotiations. He also alleged that he briefed many other people during that time, including Joseph Salgado, the Undersecretary of Energy. Landesman testified that at no time during the period from December 1985 through July 7, 1986, did anyone within the Department of Energy state that Paragraph V.G was intended to cover only the payment of receive orders paid after approval of the settlement agreement by the court. Record at 638–39. In sum, Landesman stated that Paragraph V.G expressed an intention on his part as chief negotiator of the Department of Energy to provide for the payment of the receive orders funded after December 1, 1985, out of DOE's share of the settlement funds and that the States would bear none of the burden of paying for those receive orders. Record at 599.

The States also include the affidavit of Richard Williams, the representative for the Airlines in the settlement negotiations, as extrinsic evidence supporting their interpretation of the Settlement Agreement. Record at 463–76. Williams shared Landesman's understanding of DOE's retroactive obligations under the Agreement. Williams describes in his affidavit the various stages of the negotiations and the changes in language that were incorporated. Williams stated as follows:

It is clear from the number of modifications to this language ... that this paragraph was discussed many times; and I participated in such discussions, as did DOE representatives. Nothing was said to modify Mr. Landesman's comments of December 16, which, with respect to this paragraph, had provided the operating assumption under which we had all worked. If it was the intent of senior officers of DOE to view this language as having a different meaning than that under which we negotiators were operating, it was their duty to instruct their negoti-

ators so to advise us. The difference in understanding could then be presented to all parties and the need for, or lack of need for, retroactivity language or other modifications in phrasing would be apparent (Record at 470).... Clarity of the economics was critical to us as negotiators as we strove to avoid negotiating a moving target. It was hard enough to tie down *procedures* for how to deal with funds without having to address the risk of prospective unilateral action by one of the parties which would operate to change the effect of the Agreement that entitlements exception relief would be borne exclusively by DOE. (Record at 476).

Appellant DOE argues that any representation made to counsel for the States by Landesman, DOE's chief negotiator, should be discounted because of Landesman's limited authority. The DOE supports this assertion by including an affidavit by Joseph E. Salgado, the Undersecretary of the Department of Energy. Record at 835–38. Salgado submits in his affidavit that he had "sole authority on behalf of DOE to approve settlement of the *Department of Energy Stripper Well Exemption Litigation*." Record at 835. Salgado asserts that this authority was delegated to him by John S. Herrington, Secretary of Energy. *Id.* During briefings which were part of DOE's review of the proposed Settlement, Salgado states that he informed the representatives from the States and the petroleum industry that "the agency would not enter into the proposed settlement agreement until senior level management review was completed, and that some terms of the proposal may need to be changed." Record at 836. DOE makes the argument that even though Landesman personally may have been willing to obligate the DOE to fund receive order payments retroactively, Salgado's understanding when signing the Settlement Agreement was that the DOE's obligation was purely prospective.

DOE adds that it was not only their understanding that the Final Settlement Agreement contained only a prospective obligation, but it was also the States' under-

standing. DOE refers to a letter written to Marshall Staunton, Administrator of the Economic Regulatory Administration, by Edward Modell, a representative of the States Negotiating Committee, dated July 30, 1986. Record at 399–400. Modell wrote that he was concerned that the Memorandum of Understanding did not contain the December 1, 1985 date as the time from which DOE's obligation would become effective. Modell added that this "language was needed to distribute funds to insure that the entitlements exception relief came out of DOE's share of the funds and not off the top." Record at 399. DOE claims that because the clarifying language was never inserted into the Agreement, DOE's retroactive obligation does not exist.

We find DOE's argument that its chief negotiator acted independently and without authority from the Department to be disingenuous. There is nothing in the record showing that Salgado or any official at DOE informed the States or Landesman of Salgado's alleged contrary intention prior to the time the district court approved the Agreement. Secondly, the fact that Modell wanted clarifying language inserted into the Agreement does not require the conclusion that simply because that language was not added the parties abandoned previously adopted positions. We decline to accept that unlikely premise.

We conclude that after an examination of the extrinsic evidence in this matter the district court was not clearly erroneous when it held that DOE's obligation was to fund the full amount of all entitlement exception receive orders out of its share of the settlement funds. Accordingly, the order of the district court granting the States' motion to enforce DOE's obligations is affirmed.