TEXAS AMERICAN OIL CORPO-
RATION, Plaintiff–Appellant,

v.

UNITED STATES DEPARTMENT OF
ENERGY, Defendant–Appellee.

No. 93–1152.

United States Court of Appeals,
Federal Circuit.

Jan. 6, 1995.

J. Maxwell Tucker, Winstead, Sechrest & Minick, P.C., Dallas, TX, filed response of plaintiff-appellant to defendant-appellee's petition for rehearing and In Banc suggestions.

Frank W. Hunger, Asst. Atty. Gen., William Kanter and Robert M. Loeb, Dept. of Justice, Washington, DC, filed defendant-appellee's petition for rehearing and suggestion for rehearing In Banc. Also on petition was Gilbert T. Renaut, Office of Gen. Counsel, Dept. of Energy, Washington, DC.

James F. Flug, Henry M. Banta and Dina R. Lassow, Lobel, Novins, Lamont & Flug, Washington, DC, filed brief of The States as amicus curiae in support of Dept. of Energy's suggestion for rehearing In Banc.

Before ARCHER, Chief Judge, and RICH, NIES, NEWMAN, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, SCHALL, and BRYSON, Circuit Judges.

NEWMAN, J., delivered the opinion for a unanimous court with respect to Parts I and II, and the opinion of the court with respect to Part III, in which ARCHER, C.J., and RICH, MAYER, MICHEL, LOURIE, CLEVENGER, RADER, SCHALL, and BRYSON, JJ., joined. PLAGER, J., filed an opinion concurring in part and dissenting in part, in which NIES, J., joined.

## ON REHEARING EN BANC

PAULINE NEWMAN, Circuit Judge.

Texas American Oil Corporation has appealed the decision of the United States District Court for the Northern District of Tex-

as, *Texas American Oil Corp. v. United States Dept. of Energy*, No. 3:92–CV–1146–G (N.D.Tex. Sept. 14, 1992), reversing the bankruptcy court's classification of the Department of Energy's ("DOE") claim as a creditor under the Bankruptcy Code. *In re Texas American Oil Corp.*, No. 387–33522–SAF–11 (Bankr.N.D.Tex. Mar. 5, 1992). Texas American appealed the district court's decision to the Fifth Circuit Court of Appeals, relying on subsequent changes in statutory and Supreme Court law. On motion of the DOE, opposed by Texas American, the Fifth Circuit held that the issue was within the exclusive jurisdiction of the Temporary Emergency Court of Appeals ("TECA"), and transferred the appeal. *Texas American Oil Corp. v. United States Dept. of Energy*, No. 92–1785 (5th Cir. Nov. 12, 1992) (Order). Effective April 29, 1993 the TECA was dissolved, and all remaining actions within that court's jurisdiction were transferred to the Court of Appeals for the Federal Circuit. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992). Texas American also appealed the transfer of this appeal to the TECA and now to this court.

On May 10, 1994 a panel of this court issued its decision on this appeal. *Texas American Oil Corp. v. United States Dep't of Energy*, 24 F.3d 210 (Fed.Cir.1994). The panel opinion has been withdrawn and the court now rehears the case *en banc*, for the purposes of (1) adopting the decisions of the TECA as precedent in the Court of Appeals for the Federal Circuit, and (2) overruling prior decisions to the extent that they are inconsistent with our decision herein.

## I

### ADOPTION OF PRECEDENT

As foundation for decision of the cases transferred to this court in accordance with Pub.L. No. 102–572, the Court of Appeals for the Federal Circuit adopts as precedent the body of law represented by the holdings of the Temporary Emergency Court of Appeals.

 This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other controlling author-

ity such as intervening statutory change or Supreme Court decision. *See South Corp. v. United States*, 690 F.2d 1368, 1370 n. 2 (Fed. Cir.1982). That rule also governed the TECA. *Consumers Power Co. v. United States Dep't of Energy*, 894 F.2d 1571, 1577 (Temp.Emer.Ct.App.1990). In view of the disparate jurisdictions of these two courts, substantive conflict in precedent is not expected. However, the two courts had divergent positions on certain fundamental aspects of their jurisdiction, based on their respective authorizing statutes. To remove uncertainty and avoid disruption of cases still in process, we emphasize that TECA precedent continues to apply to questions of jurisdiction, in the cases that reach the Federal Circuit as successor to the TECA.

Since Texas American has challenged the TECA's jurisdiction in this case, we first consider the correctness of the transfer from the Fifth Circuit Court of Appeals.

## II

### JURISDICTION

 When the Fifth Circuit transferred this appeal to the TECA, in accordance with *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) the Fifth Circuit's jurisdictional ruling became the law of the case, subject only to the transferee court's finding the transfer "plausible". The Supreme Court in *Christianson* had resolved a difference of opinion between the Courts of Appeals of the Seventh Circuit and the Federal Circuit, wherein each held that the other had exclusive jurisdiction of the subject matter, and each had transferred the case accordingly. The Court held that appellate courts should accept plausible transfer decisions made by sister tribunals, and that courts of appeals should adhere

strictly to principles of law of the case. Situations might arise, of course, in which the transferee court considers the transfer "clearly erroneous." But as "[t]he doctrine of the law of the case is ... a heavy deterrent to vacillation on arguable issues," such reversals should necessarily be exceptional; courts will rarely transfer

cases over which they have clear jurisdiction, and close questions, by definition, never have clearly correct answers. Under law-of-the-case principles, if the transferee court can find the transfer decision plausible, its jurisdictional inquiry is at an end.

486 U.S. at 819, 108 S.Ct. at 2179 (alterations in original) (citations omitted).

■ Our review of the Fifth Circuit's transfer ruling is conducted within the analytical framework of *Christianson.* Although the Fifth Circuit did not explain its ruling, the Court stated in *Christianson* that the fact that the appellate court "did not explicate its rationale is irrelevant, for the law of the case turns on whether a court previously 'decide[d] upon a rule of law' ... not on whether, or how well, it explained the decision." 486 U.S. at 817, 108 S.Ct. at 2178. Therefore, unless the Federal Circuit does not deem the transfer to the TECA to be plausible, our jurisdictional inquiry is at an end. *See Xeta, Inc. v. Atex, Inc.,* 852 F.2d 1280, 1281 (Fed.Cir.1988). Thus we review the TECA's selection of "issue" jurisdiction in implementation of its statutory assignment.

### A

The Economic Stabilization Act of 1970 (ESA), Pub.L. No. 91–379, 84 Stat. 799 (1970), *codified at* 12 U.S.C. § 1904 note, authorized the President to stabilize prices, rents, wages, and salaries, and to establish priorities for use and allocation of petroleum products. Section 211 of the ESA, the judicial review provision, placed trial jurisdiction in the federal district courts and created the Temporary Emergency Court of Appeals, assigning to it exclusive appellate jurisdiction in "cases and controversies arising under" the ESA:

§ 211(b)(2) Except as otherwise provided in this section, the Temporary Emergency Court of Appeals shall have exclusive jurisdiction of all appeals from the district courts of the United States in cases and controversies arising under this title or under regulations or orders issued thereunder....

The purpose was "to funnel into one court all the appeals arising out of the District Courts and thus gain in consistency of decision". S.Rep. No. 92–507, 92nd Cong., 1st Sess. 10, *reprinted in* 1971 U.S.C.C.A.N. 2283, 2292. The ESA authority expired on April 30, 1974; however, ESA sections 205 through 213 (other than section 212(b)) were incorporated by reference into section 5(a)(1) of the Emergency Petroleum Allocation Act (EPAA), which was enacted in response to nationwide shortages of petroleum products due to the 1973 Arab oil embargo. Pub.L. No. 93–159, 87 Stat. 627 (1973), *codified at* 15 U.S.C. §§ 751 *et seq.*

In January 1981 the President lifted all price controls of petroleum products. Exec.Order No. 12,287, 46 Fed.Reg. 9,909 (1981). The President's authority to promulgate regulations and controls under the EPAA expired on September 30, 1981 pursuant to a sunset provision, 15 U.S.C. § 760g, and has not been renewed. Section 760g provided that the expiration of this regulatory authority did not affect any pending action or proceeding not then finally determined, or any administrative, civil, or criminal action or proceeding, whether or not pending, based upon any act committed or liability incurred prior to the expiration date.

The Federal Courts Administration Act of 1992 amended the ESA to read:

§ 211(b)(2) Appeals from orders or judgments entered by a district court of the United States in cases and controversies arising under this title shall be brought in the United States Court of Appeals for the Federal Circuit if the appeal is from a final decision of the district court or is from an interlocutory appeal permitted under section 1292(c) of title 28, United States Code.

Pub.L. 102–572, § 102, 106 Stat. at 4506. Concurrently, 28 U.S.C. § 1295(a) was amended to add the following jurisdiction to that of the Federal Circuit:

(11) of an appeal under section 211 of the Economic Stabilization Act of 1970;

(12) of an appeal under section 5 of the Emergency Petroleum Allocation Act of 1973;

(13) of an appeal under section 506(c) of the Natural Gas Policy Act of 1978; and

(14) of an appeal under section 523 of the Energy Policy and Conservation Act. It is reported that several dozen actions remain in administrative or judicial process.

### B

The TECA interpreted its statutory authorization under ESA § 211(b)(2) as meaning "issue" jurisdiction, not "case" or "arising under" jurisdiction.[1] This interpretation has not been free of controversy, not only within the TECA but also in the regional circuit courts and among students of judicial structure. However, the TECA has steadfastly implemented the jurisdictional policy and practice of deciding only the EPAA/ESA issues in a case, leaving to the regional circuit courts all other issues arising in the same transaction or joined to EPAA/ESA issues. *See, e.g., City of Groton v. Federal Power Comm'n*, 487 F.2d 927, 935–36 (Temp.Emer.Ct.App.1973) (the TECA refused to review Federal Power Act issues after having reviewed district court ruling that Federal Power Commission order did not violate the ESA); *Associated Gen. Contractors of Am., Inc. v. Laborers Int'l Union*, 489 F.2d 749, 750–51 (Temp. Emer.Ct.App.1973) (TECA refused to hear collective bargaining issue but heard appeal of ESA issue); *Spinetti v. Atlantic Richfield Co.*, 522 F.2d 1401, 1403 (Temp.Emer.Ct. App.1975) (antitrust, fair trade, and contract issues were separated and held appealable only to the Ninth Circuit); *Longview Refining Co. v. Shore*, 554 F.2d 1006, 1009 (Temp. Emer.Ct.App.) (TECA had jurisdiction over remaining EPAA/ESA issue after district court dismissed the antitrust and contract claims), *cert. denied*, 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977); *Texaco Inc. v. United States Dep't of Energy*, 616 F.2d 1193, 1196 (Temp.Emer.Ct.App.1979) (TECA lacks jurisdiction when sole question relates to DOE Organization Act, reaffirming TECA policy of "issue" jurisdiction); *Atlantic Rich-*

*field Co. v. U.S. Dep't of Energy*, 655 F.2d 227, 233 (Temp.Emer.Ct.App.1981) (TECA refused to hear contract issue but took appeal of issue of validity of DOE remedial order).

The TECA has exercised jurisdiction of any EPAA/ESA issue whether presented by complaint, as a defense, or as a counterclaim. *See Citronelle–Mobile Gathering*, 591 F.2d at 716 (EPAA issues were raised in counterclaim, and the TECA would have heard them if appeal had not been withdrawn); *Sohio Petroleum Co. v. Caribou Four Corners, Inc.*, 573 F.2d 1259, 1262 (Temp. Emer.Ct.App.1978) (defendant's answer raised issue of EPAA stripper well exemption; appeal of district court's findings on that issue was to the TECA). Thus any issue requiring interpretation or application of the EPAA, ESA, or related regulations has been held to be within the exclusive purview of the TECA, and separated from the appeal of any other substantive issue. *Mobil Oil Corp. v. Department of Energy*, 728 F.2d 1477, 1497 (Temp.Emer. Ct.App.1983), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 849 (1984).

The TECA established two threshold jurisdictional requirements: (1) resolution of the litigation must have required application or interpretation of the EPAA/ESA or its regulations, and (2) the EPAA/ESA issue must have been adjudicated in the district court. *See Sector Refining, Inc. v. Enterprise Refining Co.*, 771 F.2d 496, 503 (Temp.Emer. Ct.App.1985) (jurisdiction depends not only on whether an EPAA issue existed but on whether one was adjudicated); *Citronelle–Mobile Gathering, Inc. v. Gulf Oil Corp.*, 591 F.2d 711, 716 (Temp.Emer.Ct. App.) (TECA has jurisdiction when resolution of litigation requires application and interpretation of the EPAA), *cert. denied*, 444 U.S. 879, 100 S.Ct. 168, 62 L.Ed.2d 109

---

1. "Issue" jurisdiction refers to the assignment of jurisdiction limited to a particular issue, whether the issue is raised by complaint or only in the answer. "Case" jurisdiction refers to jurisdiction of all of the issues in the case whenever a particular issue is present, whether that issue is raised by complaint or only in the answer. Traditional "arising under" jurisdiction refers to jur-

isdiction of all of the issues in a case whenever the jurisdiction-directing issue is raised by well-pleaded complaint. *See Coastal States Marketing, Inc. v. New England Petroleum Corp.*, 604 F.2d 179 (2d Cir.1979) (discussing possible views of the "cases and controversies arising under" language of ESA § 211(b)(2)).

(1979). When the TECA has taken jurisdiction on these criteria, the court has occasionally been required to consider and apply laws in interaction with the EPAA/ESA, in the course of deciding the issue before the court. An example is the bankruptcy cases, wherein the TECA has reviewed the classification, in accordance with the Bankruptcy Code, of claims made against a bankrupt estate under the EPAA/ESA. *E.g., United States Dep't of Energy v. West Texas Marketing Corp.*, 763 F.2d 1411 (Temp.Emer.Ct.App.1985).

Meanwhile, during the period of development of the Federal Circuit's structure, scholarly attention to the TECA's jurisdictional posture burgeoned. *E.g.,* Note, *The Appellate Jurisdiction of the Temporary Emergency Court of Appeals,* 64 Minn. L.Rev. 1247, 1272–73 (1980) (criticizing the TECA system requiring bifurcated appeals as resulting in "confusion, hardship for litigants, forced decision making, and delay"); Eric Watt Wiechmann & Charles J. Heinzer, *An Unappealing Dilemma: Searching for the Appellate Jurisdiction of the Temporary Emergency Court of Appeals,* 3 U.Bridgeport L.Rev. 305, 322 (1982) ("The existing status of the TECA's jurisdiction is unsatisfactory.") Commentators condemned the TECA's "issue" jurisdiction as entailing satellite litigation, causing transfers and retransfers of cases and parts of cases, and creating inefficiencies in the use of judicial and litigant resources.

The Federal Circuit was organized with an explicitly broader appellate assignment than that of the TECA, apparently for the purpose of avoiding the problems inherent in "issue" jurisdiction. Thus, although the Federal Circuit's jurisdiction is assigned in "arising under" words, as was that of the TECA, there is a dispositive difference: 28 U.S.C. § 1295(a)(1) and (2) provide that the Federal Circuit shall have exclusive appellate jurisdiction "if the jurisdiction of [the district] court was based, in whole or in part, on [sections 1338 and 1346, respectively] of this title". The clause "in whole or in part" is absent from the TECA authorization. In *Atari, Inc. v. JS & A Group, Inc.,* 747 F.2d 1422 (Fed.Cir.1984) (*en banc*) this court interpreted § 1295(a)(1) as meaning that the Federal Circuit has exclusive jurisdiction of and indeed must decide the non-patent issues that are appealed in cases that arise under the patent laws. We observed that Congress rejected "issue" jurisdiction for the Federal Circuit, expressly drawing a comparison with the TECA approach discussed in *Coastal States Marketing:*

> Paragraph (1) of new section 1295(a) gives the Court of Appeals for the Federal Circuit jurisdiction of any appeal in which the trial court jurisdiction was based, in whole or in part, on section 1338 of title 28.... Cases will be within the jurisdiction of the Court of Appeals for the Federal Circuit in the same sense that cases are said to "arise under" federal law for purposes of federal question jurisdiction. *Contrast, Coastal States Marketing, Inc. v. New England Petroleum Corp.,* 604 F.2d 179 (2d Cir.1979).

H.R.Rep. No. 312, 97th Cong., 1st Sess. 41 (1981). *See Atari,* 747 F.2d at 1435.

As we recognize these differences, in the interest of continuity, we affirm that the TECA precedent and practice on jurisdictional matters shall continue to apply to cases that reach the Federal Circuit by virtue of succession to the TECA.

### C

█ On this background, we consider the plausibility of the transfer of this appeal by the Fifth Circuit to the TECA.

In its transfer motion the government argued that it is necessary to apply or interpret the EPAA/ESA in deciding the issue of the bankruptcy classification of the DOE's claim under ESA section 209. The government pointed out that the TECA has consistently held that it has exclusive jurisdiction of this issue; and that the Fifth Circuit has previously transferred appeals of such issues to the TECA. Texas American argued that this case arises under the bankruptcy law, not the ESA, and urged the TECA to correct its assertion of jurisdiction.

TECA precedent and that of the regional circuit courts are not in complete accord on whether the bankruptcy classification of a

claim under ESA section 209 is an ESA issue for the purpose of appellate jurisdiction. The TECA held that this issue is within its exclusive jurisdiction in *West Texas Marketing,* 763 F.2d at 1426, and declined to revisit the question in *In re Transcontinental Energy Corp.,* 950 F.2d 733 (Temp.Emer.Ct. App.1991). Some other courts have agreed with the TECA's view of its jurisdiction; in *Transcontinental Energy* the appeal of the classification issue was transferred from the Ninth Circuit; in *In re Compton,* 889 F.2d 1104, 1105 (Temp.Emer.Ct.App.1989) the appeal of the classification issue was transferred from the Fifth Circuit. We are aware of one exception, wherein the Tenth Circuit held that the classification issue is simply a matter of bankruptcy law, and declined to transfer the appeal to the TECA. *In re Seneca Oil Co.,* 906 F.2d 1445, 1454–55 (10th Cir.1990).

In view of the TECA's ruling that its "issue" jurisdiction includes issues relating to ESA claims in bankruptcy proceedings, and our observation that the classification question at bar indeed requires interpretation of the ESA and successor statutes, see Part III, *post,* we conclude that the transfer of this appeal to the TECA was in accord with TECA precedent. Thus the transfer is plausible in terms of *Christianson.* The request of Texas American to transfer the appeal back to the Fifth Circuit must be denied.

### III

### *THE BANKRUPTCY APPEAL*

On July 2, 1987 Texas American commenced bankruptcy proceedings under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq.* The DOE filed a claim as creditor, based on the DOE's ruling that a subsidiary of Texas American had received small refiner bias entitlements in violation of section 209 of the ESA as incorporated into section 5(a)(1) of the EPAA, 15 U.S.C. § 754(a)(1). The trustee in bankruptcy classified the claim as a non-pecuniary loss in accordance with 11 U.S.C. § 726(a)(4), and placed the entire claim in Class 9 of the Plan of Liquidation. The liability for and amount of the claim are not now disputed, and the only issue is the classification priority.

The relevant classifications of the Texas American Bankruptcy Committee Plan of Liquidation are as follows:

§ 3.07 Class 7 (Unsecured) Claims—Allowed Claims of unsecured creditors, including without limitation, all Claims asserted by or on behalf of the Debentureholders.

§ 3.09 Class 9 (Non–Pecuniary Loss) Claims—Allowed Claims of holders of Allowed Claims for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive damages, as further described in 11 U.S.C. § 726(a)(4).

Section 726(a)(4) of the Bankruptcy Code subordinates non-pecuniary loss claims to the fourth priority:

**11 U.S.C. § 726. Distribution of property of the estate**

\* \* \* \* \* \*

**(a)(4)** fourth, in payment of any allowed claim, whether secured or unsecured, for any fine, penalty or forfeiture ... to the extent that such fine, penalty, or forfeiture or damages are not compensation for actual pecuniary loss suffered by the holder of such claim.

Class 7 claims are superior to Class 9; there are insufficient assets to satisfy any Class 9 claim, or to satisfy fully the Class 7 claims.

The DOE argued that since its claim for recovery under ESA section 209 was for "restitution" it should be classified with the unsecured claims of Class 7. The bankruptcy court, however, agreed with the trustee that Class 9 was the appropriate classification. The bankruptcy court held that since this DOE claim is not compensation for actual pecuniary loss suffered by the holder of the claim—as the government apparently agrees as to all or most of the claim—then it is not a Class 7 claim. Observing that there would be no recovery by or payment to the persons that suffered the pecuniary loss, the bankruptcy court concluded "that this claim must be treated as a fine, penalty or forfeiture [for it] is not compensation for actual pecuniary loss suffered by the holder of the claim". Record at 27, *In re Texas American.*

The bankruptcy court explained that the recent Supreme Court decisions in *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) and *Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) clarified that the designation of a particular recovery as "restitution" or as a "penalty" is not a matter of linguistics, but depends on the particular facts.

The DOE appealed to the district court, who reversed the bankruptcy court, citing the decision of the TECA in *West Texas Marketing* that a claim under ESA section 209 was properly placed in the same class and priority as the general unsecured claims of other creditors such as bondholders. The district court held that the TECA's decision in *West Texas Marketing* must be followed until overruled by the TECA or the Supreme Court, and therefore that the DOE's entire claim under section 209 should be classified with Class 7. In *Transcontinental Energy* the TECA followed its decision in *West Texas Marketing,* declining to review the asserted intervening statutory and other changes in law. Although the bankruptcy court remarked that in *Transcontinental Energy* the TECA had not addressed the effect of the intervening Supreme Court decisions in *Kelly* and *Davenport,* the district court pointed out that the TECA decisions had not been overruled, and thus were binding on the bankruptcy court.

### A

▮▮▮ The classification of a claim in bankruptcy is a question of law, and is reviewed for correctness. *See In re Lumber Exch. Bldg. Ltd. Partnership,* 968 F.2d 647, 649 (8th Cir.1992) ("We review *de novo* the propriety of classification"). *In re Egbe,* 107 B.R. 711, 712 (9th Cir. BAP 1989) (whether appellant is entitled to secured creditor status is a question of law, entitled to *de novo* review). In so doing we apply the TECA precedent, subject to review by the court sitting *en banc* and in light of intervening statutory and Supreme Court changes in the law.

▮▮▮ Texas American argues that there have been significant changes in statutory law and policy since *West Texas Marketing* was decided in 1985, and urges that the applicability of *West Texas Marketing* to this claim be reviewed in light of these changes. Texas American refers to the enactment in 1986 of the Petroleum Overcharge Distribution and Restitution Act, accompanied by the DOE's official changes in policy and implementation with respect to disposition of recovered overcharges to the Treasury general fund and to the states, instead of as restitution to those who were overcharged. Texas American states that these changes have controlling consequences for the issue at bar, since at least eighty percent of the DOE's claim can not be even colorably viewed as restitution. Texas American also states that the Supreme Court's analyses of penalty and restitution in bankruptcy in *Kelly* and in *Davenport* require that this court ascertain and apply an accurate view of the claimed recovery, in order to determine whether the recovery is for the benefit of individual creditors who suffered the actual pecuniary loss, or for the public at large.

We agree that these statutory, judicial, and policy changes, all occurring after the TECA's decision in *West Texas Marketing,* warrant our revisiting the issue.

### B

In accordance with the ESA, upon enforcement action brought by the DOE the courts may order restitution of the overpayment that a seller of petroleum products obtained in violation of regulated prices. ESA section 209 provides:

> ... In addition to such injunctive relief, the court may also order restitution of moneys received in violation of any such order or regulation.

Congress had stressed in enacting the ESA that the explicit reference to restitution in section 209 was to settle any doubt that "there was an inherent equitable power in the court to set things right and order restitution." S.Rep. No. 92–507, 92nd Cong., 1st Sess. 9, *reprinted in* 1971 U.S.C.C.A.N. 2283, 2291. The DOE established procedures for the identification of claimants who experienced illegal overcharges, and undertook to

administer the mandated restitution. Although restitution was achieved in some cases, as the program continued large sums of money accumulated, due to the pragmatic impossibility of identifying and making payment to those who incurred pecuniary losses due to violations of the ESA.

The courts were aware of the mounting problems of achieving the mandated restitution. In *United States v. Exxon Corp.*, 773 F.2d 1240, 1284–86 (Temp.Emer. Ct.App.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 892, 88 L.Ed.2d 926 (1986), the TECA discussed the statutory purpose of providing restitution to the persons who had actually suffered the losses. The TECA concluded that in view of the diffusion of overcharges through the distribution system, payment of the sums recovered from Exxon to the first purchasers of the petroleum products, who had simply passed the overcharges on to their customers, "would result in inequities, inconsistent with the fundamental purpose of restitution under Section 209", and "would simply result in a windfall gain for that purchaser." *Exxon*, 773 F.2d at 1286. The TECA ordered that the overcharges recovered from Exxon be channeled to the states for the purpose of funding specific energy programs designed to benefit the public. *Id.* at 1280–83. This judicial action was consistent with the "Warner Amendment", Pub.L. No. 97–377, § 155, 96 Stat. 1830 (1982), which gave the DOE authority to disburse unclaimed funds:

§ 155(a) It is the purpose of this section to provide the Secretary of Energy the exclusive authority for the disbursement of the designated petroleum violation escrow funds for limited restitutional purposes (1) which are reasonably expected to benefit the class of persons injured by such violations, and (2) which, based on information previously provided to the Congress by the

Secretary of Energy are likely not to be, through procedures established by regulation, otherwise refunded to injured persons because the purchasers of the refined petroleum products cannot reasonably be identified or paid or because the amount of each purchaser's overcharge is too small to be capable of reasonable determination.

96 Stat. at 1919. By this statute the Secretary of Energy was required to distribute the escrow funds to the governors of each of the states, in an amount based on the state's proportionate share of nationwide consumption of refined petroleum products from 1973 to 1981. Pub.L. No. 97–377, § 155(b), (d). Each state was required to use the funds under one or more of five existing federal energy conservation programs identified in the Warner Amendment, for purposes of weatherization of buildings, implementation of state energy conservation programs, reduction of energy consumption in schools and hospitals, promotion of conservation by businesses and individuals, and assisting the poor with home utility bills.[2]

In *In re Dep't of Energy Stripper Well Exemption Litigation*, 653 F.Supp. 108 (D.Kan.1986), *aff'd*, 855 F.2d 865 (Temp.Emer.Ct.App.1988), the district court recognized the inability of the government to identify specific overcharge victims, and approved a settlement that provided for disbursal of the recovered overpayment that could not be restored to those actually injured. Settlement Agreement, *reprinted in* 17 DOE ¶ 90,509 (1988). The settlement required that a sufficient amount of money be retained by the DOE in escrow to satisfy any claims for individual losses, and that the balance of the funds be distributed half to the states for use in energy-related programs, and half to the United States Treasury or such other use as the Secretary of Energy directed.

---

2. The programs set forth in § 155(e)(2) of the Warner Amendment included:

(A) the program under part A of the Energy Conservation and Existing Buildings Act of 1976 (42 U.S.C. §§ 6861 *et seq.*);

(B) the programs under part D of the Energy Policy and Conservation Act (relating to primary and supplemental state energy conservation programs; 42 U.S.C. §§ 6321 *et seq.*);

(C) the program under part G of title III of the Energy Policy and Conservation Act (relating to state energy conservation for schools and hospitals; 42 U.S.C. §§ 6371 *et seq.*);

(D) the program under the National Energy Extension Service Act (42 U.S.C. §§ 7001 *et seq.*); and

(E) the program under the Low–Income Home Energy Assistance Act of 1981 (42 U.S.C. §§ 8621 *et seq.*).

Neither the *Exxon* nor the *Stripper Well* case was concerned with bankruptcy issues or consequences. However, these dispositions of recoveries under ESA section 209 illustrate the recognition by the courts and by Congress that it was not possible to restore the recovered overcharges to the persons who suffered the losses, as the ESA had contemplated and required.

Reflecting the increasing accumulation of escrow funds, the Warner Amendment was superseded by the Petroleum Overcharge Distribution and Restitution Act of 1986 ("PODRA"), Pub.L. No. 99–509, Title III, § 3002, 100 Stat. 1881 (1986), *codified at* 15 U.S.C. §§ 4501–4507. In enacting the PODRA, Congress referred to the billions of dollars that had accumulated and for which restitution to the persons injured was not possible. The PODRA requires the DOE to reserve sufficient funds to make restitution to those who suffered the actual losses, 15 U.S.C. § 4502(c)(1), and to pay the excess to federal and state treasuries "as indirect restitution":

### 15 U.S.C. § 4502(d) Disbursement of excess amount as indirect restitution for energy conservation programs

(1) [T]he Secretary shall promptly provide for the disbursement of a portion or all of such excess amount for use in energy conservation programs. The amount so disbursed for a fiscal year shall be the smaller of—

(A) $200,000,000 minus the amount of Federal funds appropriated for energy conservation programs for such fiscal year; or

(B) the amount determined under subsection (c) of this section to be the excess amount for such fiscal year.

\* \* \* \* \* \*

### § 4503 Deposit of remainder of excess amount into the Treasury as indirect restitution

The amount that remains from the excess amount described in section 4502(c) of this title after all disbursements have been made for the fiscal year under section 4502(d) of this title shall be deposited by the Secretary of the Treasury into the general fund of the Treasury.

The disbursement plan set in the PODRA was a departure from the restitutionary plan of the ESA, in that Congress now authorized distribution to the states and deposit of recovered overcharge funds directly into general fund of the Treasury. The Committee Report estimated that the PODRA would result in deposit to the federal Treasury of $1.7 billion for fiscal years 1987 through 1989. H.R.Rep. No. 727, 99th Cong., 2nd Sess. 41, *reprinted in* 1986 U.S.C.C.A.N. 3607, 3637. In implementation, the DOE in 1986 issued a "Statement of Modified Restitutionary Policy in Crude Oil Cases":

Up to 20 percent of the funds will be reserved for payment of claims of eligible parties, and the balance will be divided [by distributing one half to] the states, territories and possessions of the United States, and the [remaining half to the] U.S. Treasury, as indirect restitution to unidentified injured parties.

51 Fed.Reg. 27,899 (1986).

Thus by statute the major portion of the ESA section 209 recovery is now paid to the states and the general fund of the United States Treasury. The DOE argues that this change in beneficiary from those persons who suffered direct pecuniary losses, to the federal and state governments and the partial usage for energy-related purposes, is the "equivalent" of restitution, and thus requires the bankruptcy treatment of this claim as restitution. The DOE states that since the entire nation was damaged by petroleum price overcharges, and the economy generally will benefit from reduction in the national debt, this payment to federal and state governments should be viewed as restitution to the nation.

Texas American points out that the only issue is the bankruptcy classification of the claims of Texas American's creditors, and that it is the Bankruptcy Code that applies. The Bankruptcy Code requires that the claims of actual out-of-pocket creditors have priority over claims for sums to be paid to public bodies based on wrongdoing of the debtor. Texas American points out that the government is not claiming that it suffered

an actual pecuniary loss, in terms of the bankruptcy subordination statute, in contrast to the debentureholders of Class 7 of the Plan of Liquidation. Texas American states that since at least eighty percent of the DOE's section 209 claim is on behalf of the federal and state governments to whom the recovery will be paid, it is incorrect to classify this part of the claim with the claims of creditors who have suffered an actual out-of-pocket loss. In considering these aspects, we turn first to the principles of restitution as embodied in the ESA and amended in the PODRA, as applied in the bankruptcy context.

## C

■ Restitution is an equitable remedy whereby the wrongdoer is required to restore the injured person to the situation that prevailed before the wrong was committed. *Restatement of Restitution,* §§ 150–159, Introductory Note (1937). There must be some relationship between the person injured and the recipient of the recovery. *See Hughey v. United States,* 495 U.S. 411, 416, 110 S.Ct. 1979, 1982, 109 L.Ed.2d 408 (1990) ("the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event").

■ It is undisputed that no significant restitution has been made or is expected to be made to any person who actually suffered a pecuniary loss due to the small refiner bias overpayments to the Texas American subsidiary company. It is undisputed that at least eighty percent of the recovery will be paid to the federal and state governments. Government has the sole interest in this bankruptcy claim. This is relevant to section 726(a)(4) of the Bankruptcy Code, which defines the fourth priority as including recovery of a fine, penalty, or forfeiture, to the extent that such recovery is "not compensation for actual pecuniary loss suffered by the holder of such claim".

■ The DOE points out that in *West Texas Marketing* the TECA held that the "restitutionary character" of the DOE's recovery under ESA section 209 is unrelated to whether the recovered funds will be distributed to the actual parties who were overcharged. 763 F.2d at 1426. While we agree that "restitution" and the disgorgement of "unjust enrichment" are related concepts, we take note that *West Texas Marketing* was decided before the courts, Congress, and the DOE resolved the growing problems flowing from the inability to "restore" the losses of the persons who were overcharged. When restitution to those who suffered the losses was not feasible, the acknowledged public purpose of the section 209 prosecutions was to remedy unjust enrichment of the wrongdoer, not to "make whole" those persons who were overcharged.

■ Congress, the DOE, and the courts all acted for this purpose. The PODRA-authorized disposition of recovered overcharges to governmental treasuries does not require that the federal and state governments suffered a pecuniary loss. Compare the recovery in *United States v. P/B STCO 213,* 756 F.2d 364 (5th Cir.1985), wherein the government expended funds to clean waters polluted by the defendant, and sought to recover the actual cost of the cleanup. In contrast, the government in this case expended no funds and suffered no actual loss; yet the overcharges are recovered by the government from the wrongdoer, and retained for governmental use.

■ The Bankruptcy Code serves a quite different public purpose. In effecting the principles of creditors' and debtors' rights and obligations, one of the firmest of principles is that creditors who suffered a pecuniary loss to the bankrupt have priority of claim over those who suffered no pecuniary loss. *See Simonson v. Granquist,* 369 U.S. 38, 40–41, 82 S.Ct. 537, 538–39, 7 L.Ed.2d 557 (1962) (discussing purpose of bankruptcy laws to bar claims against a bankrupt except those based on a pecuniary loss); 11 U.S.C. § 726(a); 4 Collier on Bankruptcy ¶ 726.02[4] (15th ed. 1986). The DOE argues that the wording of § 726(a)(4) makes pecuniary loss relevant only after it is determined that a penalty is involved, referring to *West Texas Marketing,* 763 F.2d at 1426. However, when the PODRA, enacted after *West Texas Marketing* was decided, recognized that restitution was not possible and authorized pay-

ment to public treasuries of the unrestored portion of the recovered overcharges, the character of that portion of the recovery, for the purpose of bankruptcy relationships, was changed in a significant way.

Restitution requires not only disgorgement of illegal profits, but also their return to the persons who suffered the loss. *See Kelly,* 479 U.S. at 51–52, 107 S.Ct. at 362 ("[R]estitution is forwarded to the victim, and may be calculated by reference to the amount of harm the offender has caused.") When those injured are not restored to their previous position the disgorgement partakes not of restitution, but of recovery by government of the illegal gains for remedial and enforcement purposes. Thus the statutory remedy under the PODRA, from the bankruptcy viewpoint, encompasses two distinct classes of potential creditors: the specific persons who suffered an actual pecuniary loss, and the governments who receive the unclaimed residue. *Cf. In re Hirsch–Franklin Enters., Inc.,* 63 B.R. 864, 872 (Bankr. M.D.Ga.1986) (government claim for a pecuniary loss penalty held entitled to priority, and claim for non-pecuniary loss penalty subordinated in accordance with § 726(a)(4)); 4 Collier on Bankruptcy ¶ 726.02[4] (in a treble damage antitrust claim, the single damage claim is classified under § 726(a)(2) while the remainder is classified under § 726(a)(4)).

In discussing the subordination statute, the bankruptcy court in *In re Schultz Broadway Inn, Ltd.,* 89 B.R. 43, 44 (Bankr. W.D.Mo.1988), *aff'd,* 912 F.2d 230 (8th Cir. 1990), stated that

> students of bankruptcy law know that all penalties are divided into two categories, i.e., "pecuniary loss penalties" and "non pecuniary loss penalties." ... [I]f such fines or penalties are punitive in nature and not for actual pecuniary loss, they are not given priority but rather are subordinated in order of payment under section 726(a)(4).

*See also* 3 Collier on Bankruptcy ¶ 507.04[7][h]. These differences have been readily recognized in other contexts. *See, e.g., In re Unified Control Sys., Inc.,* 586 F.2d 1036, 1037–38 (5th Cir.1978) ("[T]he label placed upon an imposition in a revenue measure is [not] decisive in determining its character.... the character of a penalty cannot be changed by calling it a tax.") (citation omitted). In *Bowles v. Farmers Nat'l Bank,* 147 F.2d 425 (6th Cir.1945), involving recovery of overcharges under the Emergency Price Control Act of 1942, the court stated that "if a sum of money is recovered by a third person for violation of a statute instead of the person injured ... it constitutes a penalty rather than damages". *Id.* at 428 (holding that the recovery was a penalty, for tax purposes, because it was paid not to those injured, but to the government). In *Porter v. Montgomery,* 163 F.2d 211 (3d Cir. 1947) the court commented that a "civil action is for damages if it is brought for the compensation of the injured individual. It is for a penalty if it seeks to obtain a sum of money for the state, an entity which has not suffered direct injury by reason of any prohibited action." *Id.* at 214.

In enacting the ESA, Congress intended and required that the recovery be distributed to the persons who were directly injured by the illegal overcharges. When such distribution was recognized as impossible, Congress changed the statute. Although the usage "indirect restitution" in the PODRA provides a certain historical continuity, the words must yield to substance. Applying the PODRA in light of the considerations relevant to the bankruptcy classification requires a realistic assessment of the nature of the claim to the recovery that will be paid to the governmental treasuries. Such an assessment is illustrated in the Supreme Court decisions in *Kelly* and *Davenport.* Although these decisions are not as pointed as Texas American urges, they illustrate the principle that remedies styled as "restitution" must be viewed for bankruptcy purposes in light of the particular facts. In *Kelly,* 479 U.S. at 52–53, 107 S.Ct. at 362–63, the Court held that payment of "restitution" of welfare benefits in connection with a criminal sentence is treated like a criminal penalty and is exempt from discharge in bankruptcy. In *Davenport,* 495 U.S. at 561–62, 110 S.Ct. at 2132–33, the Court held that subordination to 11 U.S.C. § 726(a)(4) includes civil as well as criminal fines and penalties, as a corollary to

the discharge provision of 11 U.S.C. § 523(a)(7).

*Kelly* and *Davenport* thus applied in specific bankruptcy contexts the general principle that the nature of a remedy depends on "whether the wrong sought to be redressed is a wrong to the public, or a wrong to the individual". *Huntington v. Attrill,* 146 U.S. 657, 668, 13 S.Ct. 224, 228, 36 L.Ed. 1123 (1892). The TECA remarked in *Citronelle–Mobile Gathering, Inc. v. Edwards,* 669 F.2d 717, 722 (Temp.Emer.Ct.App.1982) that the DOE is charged with enforcing "public, not private rights". *See also In re Dep't of Energy Stripper Well Exemption Litigation,* 968 F.2d 27, 37 n. 10 (Temp. Emer.Ct.App.1992) (the disbursement to the state and federal treasuries is "reimbursement to the true victims of the overcharges, the public"); *Lea Exploration, Inc. v. Department of Energy,* 843 F.2d 510, 515 (Temp.Emer.Ct.App.1988) (ESA section 209 action is characterized as a claim to enforce public rights). These principles are not platitudes, and when applied in the bankruptcy context they have substantive effect.

■■■■ The enactment of the PODRA, and other dispositions of the reservoir of unclaimed recovery by the DOE under section 209, did not convert the federal and state governments into out-of-pocket creditors; the PODRA simply established their right to receive the unclaimed recoveries. The noncompensatory portion of the recovery fits the statutory definition of a "forfeiture ... to the extent that such ... forfeiture [is] not compensation for actual pecuniary loss suffered by the holder of such claim." 11 U.S.C. § 726(a)(4). It is contrary to bankruptcy principles to grant these residuary donees the same priority of claim, under the bankruptcy laws, as debentureholders and others who suffered an actual pecuniary loss to the bankrupt entity. In accordance with these principles, the consequences of the misconduct of bankrupts should not be visited upon their innocent creditors, which is the effect if non-compensatory penalties and forfeitures are not subordinated to the claims of unsecured creditors. *Simonson v. Granquist,* 369 U.S. at 41, 82 S.Ct. at 539.

In addition to the enactment of the PODRA, the Supreme Court decisions in *Kelly* and *Davenport,* clarifying certain principles with respect to restitution and subordination in bankruptcy, all occurred after *West Texas Marketing* was decided by the TECA. Although *Transcontinental Energy* was decided thereafter, in that terse opinion the TECA did not discuss any of these changes in law. We conclude that the rulings in *West Texas Marketing* and *Transcontinental Energy* are no longer viable, insofar as they relate to the bankruptcy classification of claims under ESA section 209. To the extent that these rulings conflict with our decision herein, they are overruled.

### Decision

■■■■ The DOE's section 209 claim in these bankruptcy proceedings is properly separated into claims for pecuniary and nonpecuniary losses. The portion claimed on behalf of identified persons who suffered an actual pecuniary loss, due to the overcharges remedied under section 209, is properly classified in Class 7 of the Plan of Liquidation. The claim for the portion to be paid to the federal and state governments is properly classified in Class 9 of the Plan of Liquidation, for this claim does not represent an actual pecuniary loss to the claimants.

The judgment of the district court is reversed and the case is remanded for classification of the section 209 claim in a manner consistent with this opinion.

### Costs

No costs.

*REVERSED AND REMANDED.*

PLAGER, Circuit Judge, with whom NIES, Circuit Judge, joins, concurring in part and dissenting in part.

I concur with those portions of the court's opinion adopting TECA precedent and TECA's "issue" jurisdiction, as well as the court's analysis of the propriety of the Fifth Circuit's transfer of this case. I also agree generally that determining the proper bankruptcy classification of the Department of Energy's ("DOE") claim against Texas

American under § 209 of the Economic Stabilization Act requires consideration of whether that claim is punitive or restitutionary. I respectfully dissent, however, from the court's holding on classification, because I believe that the portion of DOE's claim to be disbursed through "indirect restitution" *is* restitutionary, in that it helps restore the pecuniary loss of actual overcharge victims who are simply too numerous to identify for individual compensation. Unlike the majority, I do not believe that indirect restitution, as a means of accessing all of those who suffered a real and measurable loss, vindicates a "public right" in the ordinary sense of the right to compliance with the law, which inheres in all members of a society.

Moreover, having bound ourselves by TECA precedent, I am not persuaded that the statutory or case law developments cited by the majority warrant departure from that precedent. In classifying DOE's § 209 claim under the bankruptcy code, there is no issue of protecting state policy initiatives from unanticipated federal interference, as there was in *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986), and *Pennsylvania Public Welfare Dept. v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990). Moreover, Congress presumably was aware in drafting PODRA, heavily relied on by the majority, of *United States Dept. of Energy v. West Texas Marketing Corp.,* 763 F.2d 1411, 1426 (Temp.Emer.Ct.App.1985), in which TECA rejected the argument that an inability to identify actual overcharge victims changed the restitutionary character of DOE's § 209 claim for bankruptcy classification purposes, at a time when a substantial portion of § 209 funds likely would be paid to the state and federal governments as indirect restitution. *See* 10 C.F.R. § 205.199I (1979) (permitting payment to Treasury on behalf of overcharge victims); DOE Ruling 1984–1, 49 Fed.Reg. 22,063 (amending 10 C.F.R. ch. II, subch. A, App. to clarify that DOE considers payments to states and Treasury permissible to remedy violations of price controls).

While PODRA does not govern this case *per se,*[1] it expresses Congress' endorsement of indirect restitution as a means of achieving the restitutionary objectives of § 209 (not, as the majority asserts, a departure from those objectives); this harmonizes with *West Texas Marketing* and reflects more than "a certain historical continuity." *Majority op.,* at 1571. The states who are losers in this case may be able to get Congress to state its intention in a manner that leaves no doubt in anyone's mind, but it should not be necessary.

---

1. The claim at issue in this case is subject to disposition in accordance with the Final Settlement Agreement in *In re Department of Energy Stripper Well Exemption Litigation,* 653 F.Supp. 108 (D.Kan.1986), *aff'd,* 855 F.2d 865 (Temp.Emer.Ct.App.1988), and DOE's Statement of Modified Restitutionary Policy in Crude Oil Cases, 51 Fed.Reg. 27,899 (1986), and thus is expressly exempt from the terms of PODRA. *See* 15 U.S.C. §§ 4501(c)(2), 4502(a)(2).